### In re NORTHGATE COMPUTER SYSTEMS, INC., Debtor.

**Brian F. Leonard, Trustee of the Chapter 7 Bankruptcy Estate of Northgate Computer Systems, Inc., Plaintiff,**

v.

**Mylex Corporation, Defendant.**

**Bankruptcy No. 94–34357.**

**Adversary No. 96–3298.**

United States Bankruptcy Court, D. Minnesota, Third Division.

Oct. 15, 1999.

Marcia E. Gerston, Levy, Greenfield & Davidoff, LLP, San Jose CA, Todd Gurstel, and Jennifer Berquist, Minneapolis, MN, for Defendant.

Brian F. Leonard and Eric Cook, Minneapolis, MN, for Plaintiff.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTS II THROUGH V OF PLAINTIFF'S COMPLAINT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court for hearing on the Defendant's motion for summary judgment. Marcia E. Gerston appeared on behalf of the Defendant; Todd L. Gurstel and Jennifer Berquist noted appearances as local counsel. Eric Cook and Brian F. Leonard appeared on behalf of the Plaintiff. Upon the moving and responsive documents and the arguments of counsel, the Court memorializes the following decision pursuant to FED. R. BANKR. P. 7052.

## I. PROCEDURAL BACKDROP

The Debtor is a Minnesota corporation that was engaged in the business of assembling and selling personal computers in the business and consumer markets. On August 3, 1994, several of its trade creditors filed a involuntary petition for relief under Chapter 7 against it. On September 21, 1994, the Debtor voluntarily converted the case to one under Chapter 11. Between May, 1995 and March, 1996, six different proposed plans of reorganization were filed by various changing alliances among the Debtor, its Unsecured Creditors Committee, and HW Electronics, Inc., a major creditor. After the Committee withdrew the last such plan, the Court granted the United States Trustee's motion to convert the case to one under Chapter 7. The Plaintiff then was appointed the Trustee of the Debtor's estate.

## II. NATURE OF ADVERSARY PROCEEDING

For several years before the Debtor was put into bankruptcy, the Defendant supplied the Debtor with component computer parts. During the pendency of the case under Chapter 11, the Debtor and, especially, HW Electronics, Inc. urged that litigation against the Defendant be made a cornerstone of a liquidating plan. After the case was reconverted to one under Chapter 7, the Plaintiff filed this adversary proceeding. His theories of suit largely track those proposed before the conversion of the case.

In his amended complaint, the Plaintiff makes the following fact averments:

1. On July 22, 1992, certain officers and directors of the Defendant, with an entity called "Marjac Investment, Inc." (collectively termed "the Mar-

jac Group") purchased a controlling interest in the Debtor.

2. Thereafter, the Marjac Group caused to have James Goetz and then Khaled Ibrahim elected in succession as chief executive officer of the Debtor. Ibrahim served as a director, chief financial officer, treasurer, and vice-president of finance of the Debtor under Goetz's presidency. Both Goetz and Ibrahim had been officers of the Defendant before their appointment as chief executive officer and president of the Debtor.

3. At relevant times, M. Akram Chowdry, Yaqub Mirza, and Ismail Dudhia[1] were officers, directors, or shareholders of the Defendant; became directors, officers, or shareholders of the Debtor; and then held these capacities simultaneously.

4. As a result, the Defendant "effectively controlled the Debtor and Debtor's Board of Directors."

5. From 1991 to 1993, the Defendant sold component computer parts to the Debtor, becoming its exclusive supplier of motherboards during this time.

6. During this time, the Defendant manipulated its control of the Debtor through the persons of Goetz, Ibrahim, Chowdry, Mirza, Dudhia, and others, to induce the Debtor to:

 a. accept motherboards that had become obsolescent due to the rapid upgrading of quality and reduction of price in the prevailing market;

 b. accept those and other components at "prices inflated above fair market value"; and

 c. make payment to the Defendant, "as a preferred vendor, to the detriment of the Debtor's [other] creditors."

7. During the one year prior to the commencement of the Debtor's bankruptcy case, the Debtor made payment by check or wire transfer to the Defendant for purchase of component parts, in an amount totaling at least $224,675.00.

8. In using its control of the Debtor to induce it to enter into the described transactions, the Defendant caused the Debtor "to pay funds and transfer resources to [the Defendant] which should have been utilized by the Debtor to develop, manufacture, and sell products which did not contain" components from the Defendant. This caused the Debtor to "suffer ... substantial economic losses and the destruction of its business ..."

In five substantive counts of his amended complaint, the Plaintiff seeks the following relief:

1. The avoidance of all transfers of funds to the Defendant that were made within the year before the commencement of the Debtor's bankruptcy case, to the extent that they were preferential within the meaning of 11 U.S.C. § 547(b);

2. The avoidance of all such payments, to the extent that they were actually-fraudulent transfers within the scope of 11 U.S.C. § 548(a)(1), or constructively-fraudulent transfers within the scope of 11 U.S.C. § 548(a)(2);

3. The avoidance pursuant to 11 U.S.C. § 544 of all transfers from the Debtor to the Defendant that fell within the scope of the Minnesota enactment of the Uniform Fraudulent Transfer Act, MINN. STAT. §§ 513.41–.51;

4. An adjudication that Chowdry, Ibrahim, Dudhia, and others breached

---

1. The spelling on these persons' names is per the Defendant's submissions, which included various corporate records of the Debtor that should be presumed to be accurate. The variant spellings in the Plaintiff's complaint are probably wrong.

their fiduciary duty to the Debtor while they were acting as its officers or directors, with the intent to confer benefit on the Defendant, and an award of damages from the Defendant to redress those persons' breach of their duty; and

5. A judgment subordinating the Defendant's claim against the estate to the claims of all other creditors of the Debtor, pursuant to 11 U.S.C. § 510.

In its answer to the Plaintiff's amended complaint, the Defendant admits that Goetz and Ibrahim served as officers of the Defendant until certain specified dates, and that "at one time" Chowdry, Dudhia and Mirza served simultaneously as directors of the Debtor and the Defendant. It also admits that, generally, it sold computer components to the Debtor; that it received the specific checks or wire transfers from the Debtor that the Plaintiff identifies in Exhibit A to his complaint; and that the payments were in consideration for merchandise sold to the Debtor. After denying or professing insufficient knowledge as to various fact allegations, the Defendant raises seventeen designated affirmative defenses. They include most or all of the statutorily-recognized defenses to actions for avoidance of preferential or fraudulent transfers. The Defendant also raises a theory akin to lack of proximate cause, and asserts that substantial "present value" must be attributed to the transfers' coincidence in time with "a good faith effort to rehabilitate [the] Debtor." In its prayer, the Defendant requests that the Plaintiff be fully denied judgment, and that it recover its costs.

### III. MOTION AT BAR

The parties went through a lengthy discovery process, under several extensions of deadlines previously fixed pursuant to FED. R. BANKR. P. 7016. After the close of discovery, the Defendant filed the motion at bar pursuant to FED. R. BANKR. P. 7056.[2]

The Defendant takes the basic theory of its motion from the Supreme Court's definitive decision, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In that case, the Court recognized that

> [o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and ... it should be interpreted in a way that allows it to accomplish this purpose.

477 U.S. at 323–324, 106 S.Ct. 2548 (footnote omitted). Thus, in the Court's view,

> ... the plain language of Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

477 U.S. at 322, 106 S.Ct. 2548. To make such a preemptive strike, the movant discharges its burden

> ... by "showing"-that is, pointing out to the [trial] [c]ourt-that there is an absence of evidence to support the nonmoving party's case.

477 U.S. at 325, 106 S.Ct. 2548. The movant must recapitulate the extant fruits of investigation and discovery, and then must

---

2. This rule makes FED. R. CIV. P. 56 applicable to adversary proceedings in bankruptcy. In pertinent part, FED. R. CIV. P. 56(c) provides that, upon a motion for summary judgment, [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits [submitted in support of the motion], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

identify the deficiency in the respondent's case: a lack of evidence to establish one or more of the specific elements that the respondent would have to prove under law to prevail on its claim or defense. *Hanson v. F.D.I.C.*, 13 F.3d 1247, 1253 (8th Cir.1994) (movant for summary judgment seeking to defeat respondent's claim or defense must first "affirmatively show the absence of evidence in the record" as to at least one element of respondent's case).

■ Once the movant has done this, the burden shifts to the respondent to produce just that evidence. 477 U.S. at 322, 324, 106 S.Ct. 2548. It may do so "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ..." *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. If the respondent produces evidence that is "significant" and "probative," *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990), as well as "substantial," *Krause v. Perryman*, 827 F.2d 346, 350 (8th Cir. 1987), it will have made out a genuine issue of material fact, and the motion must be denied. If the respondent produces no responsive evidence; if its evidence does not have the probity and substance required to meet its initial burden at trial; or if the basic evidence does not logically support an inference that is necessary to prove up the element, the motion proceeds to the legal step-whether the movant is "entitled to judgment as a matter of law," as Rule 56 contemplates. *In re Hauge*, 232 B.R. 141, 144 (Bankr.D.Minn.1999). A lack of proof as to one or more elements of the respondent's claim or defense will require that the motion be granted. *Celotex*

*Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548.

The Defendant maintains that it is entitled to judgment in its favor, "as a matter of law," on four of the five counts of the Plaintiff's amended complaint.[3] In its original motion papers, it "points out" that there is no evidence to establish that the Defendant had a fiduciary duty to the Debtor at any point during their business relationship. The Defendant acknowledges the possibility that Chowdry, Dudhia, and Mirza had such a duty as individuals, in their status as directors or officers of the Debtor. However, it argues that no statute, rule, or court decision imposed such obligations on the Defendant, an entity distinct from its own officers and directors. At most, the Defendant submits, the two corporations had a simple contractual relationship of supplier and purchaser for several years, which did not entail a heightened duty. Thus, as the Defendant would have it in the end, the Plaintiff sued the wrong party[4]; the relationship of the named parties did not give rise to a direct fiduciary duty; and under the current state of the law the Plaintiff cannot attach liability to the Defendant for the acts of the common directors and officers, either derivatively or vicariously.

This, the Defendant maintains, defeats Count IV of the Plaintiff's complaint, on a minimal gleaning of uncontroverted facts. Then, it posits, there is no admissible or probative evidence to support the Plaintiff's accusation of a predatory and targeted overpricing of motherboard compo-

---

**3.** The Defendant does not move for summary judgment on Count I, that for avoidance under § 547(b).

**4.** The phrase "in the end" is not just a stylistic flourish. The caption and text of the Plaintiff's original complaint named "John Doe, Mary Rowe, and XYZ Corporation" as defendants in addition to the present Defendant. The text identified these parties as

individuals or entities, upon information and belief, with unknown addresses, ... [who] were officers, directors or sharehold-

ers of Defendant Mylex, Debtor or both entities at all times relevant herein.

The prayer in the original complaint contained a request

[f]or an Order and judgment against [the] Individual Defendants for the breach of their fiduciary obligations to [the] Debtor ...

The Plaintiff's amended complaint, however, omits these fictive names from its caption, text, and prayer for relief. The corporate Defendant here is the only one remaining.

nents, or its theory that the Defendant exploited a contrived control of the Debtor, to extract so much value out of it that its downfall was inevitable. The Defendant insists that the evidence shows only that the Defendant had set prices for the Debtor at a level commensurate to the credit risk it was assuming—on the account of a customer with fluctuating sales, unstable operations, and an outstanding payable that persisted at a high level. This, the Defendant argues, would prevent a finding for the Plaintiff on the element of lack of reasonably-equivalent value, an essential one under either of his fraudulent transfer theories. In turn, it argues, the evidence indicates no more than hard bargaining on its own part in its dealings with the Debtor-far short of the pervasively-inequitable conduct that must be found to support equitable subordination under the remaining count.

The Plaintiff responds with two evidentiary submissions: his own affidavit, framed to farm in copies of various documents and excerpts from transcripts; and the affidavit of James Goetz, the Debtor's president and chief executive officer for nine months in 1992–1993. Between them, the Plaintiff argues, these documents show that he can prove up all elements of the four counts.

The final item properly in the record[5] is the Defendant's reply papers. They consist of a legal memorandum and a separate paper that contains detailed evidentiary objections to most of the recitations in Goetz's affidavit, and to many of the exhibits proffered by the Plaintiff.

The Plaintiff's only rejoinder to the reply was his counsel's insistence at oral argument that the Court must "presume" the facts proposed by the Plaintiff "to be true," after viewing the evidence in the light most favorably to him.

5. After the hearing, both parties submitted supplementary materials without seeking prior leave of the Court. The record, however, was closed at the end of oral argument, and

## IV. ANALYSIS

### A. Relevant Standards for Summary Judgment.

The proposition very last cited is a traditional (if too often broad-brushed) chestnut of summary judgment theory. It goes back to *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *United States v. Diebold, Inc.* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (both observing that evidentiary submissions by movant for summary judgment "must be viewed in the light most favorable to the opposing party").

The Plaintiff's former point, however, is misplaced. The assignment of truthfulness to a respondent's fact averments is a function of the analysis in a motion for dismissal under FED. R. CIV. P. 12(b)(6). *E.g., Midwestern Machinery, Inc. v. Northwest Airlines, Inc.*, 167 F.3d 439, 441 (8th Cir.1999); *Springdale Educ. Ass'n v. Springdale School Dist.*, 133 F.3d 649, 651 (8th Cir.1998); *Kohl v. Casson*, 5 F.3d 1141, 1148 (8th Cir.1993); *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir.1993); *Haggy v. Solem*, 547 F.2d 1363, 1364 (8th Cir.1977); *Sartin v. Cmr. of Public Safety*, 535 F.2d 430, 432 n. 1 (8th Cir.1976). This dovetails with the main function of that rule—which is to dispose of claims that are not even recognized by law, after assuming the *pleaded* facts. *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993); *Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.* 988 F.2d 1157, 1160 (Fed.Cir. 1993). *Cf. Neitzke v. Williams*, 490 U.S. 319, 326–327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (Rule 12(b)(6) procedure "operat[es] on the assumption that the factual allegations in the complaint are true...").

■ The purpose of Rule 56, however, is different: "to isolate and dispose of *factually* unsupported claims or defenses."

remains closed. The Court has neither read nor considered the content of either post-hearing submission.

*Celotex Corp. v. Catrett,* 477 U.S. at 323–324, 106 S.Ct. 2548 (emphasis added). *See also Prudential Ins. Co. v. Hinkel,* 121 F.3d 364, 366 (8th Cir.1997). Thus, the usual focus in a motion for summary judgment is on the existence of *admissible and probative evidence* to support the challenged claim or defense. The making of a motion framed in this way imposes a burden *of production* on the respondent, to bring such evidence forward. *Prudential Ins. Co. v. Hinkel,* 121 F.3d 364, 366 (8th Cir.1997); *F.D.I.C v. Bell,* 106 F.3d 258, 263 (8th Cir.1997); *Demming v. Housing and Redevel. Auth.,* 66 F.3d 950, 955 (8th Cir.1995); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307, 1310 (8th Cir.1993).[6]

Since *Celotex,* the courts have repeatedly emphasized that the substantive content of a respondent's evidentiary submissions must closely mirror the proof that it would adduce at trial, to make out a true fact issue. *E.g., JRT, Inc. v. TCBY Systems, Inc.,* 52 F.3d 734, 737 (8th Cir.1995); *Churchill Bus. Credit, Inc. v. Pac. Mut. Door Co.,* 49 F.3d 1334, 1337 (8th Cir.1995) (respondent's evidence must be "[ ]sufficient to permit a finding in its favor on the disputed issue . . ."); *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d at 1310; *Financial Timing Pubs. v. Compugraphic Corp.,* 893 F.2d 936, 942 and n. 6 (8th Cir.1990). This is prescribed by the rule itself, at FED. R.

CIV. P. 56(e).[7] *Miller v. Solem,* 728 F.2d 1020, 1026 (8th Cir.1984).

Thus, affiants should make recitations sufficient to establish the foundation for attached documentary exhibits. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1551 (9th Cir. 1989); *Countryside Oil Co., Inc. v. Travelers Ins. Co.,* 928 F.Supp. 474, 482 (D.N.J. 1995); *Schibursky v. Int'l Business Machines Corp.,* 820 F.Supp. 1169, 1176 (D.Minn.1993). They must demonstrate personal knowledge of the facts to which they attest. *El Deeb v. University of Minnesota,* 60 F.3d 423, 428–429 (8th Cir. 1995); *LensCrafters, Inc. v. Vision World, Inc.,* 943 F.Supp. 1481, 1495–1496 (D.Minn. 1996). Finally, they must establish their expert status for technical opinions that they offer. *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.,* 922 F.2d 220, 225 (5th Cir.1991); *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 424 (5th Cir.1987); *Murphy v. Ford Motor Co.,* 170 F.R.D. 82, 85 (D.Mass.1997); *Estate of Cole v. Fromm,* 941 F.Supp. 776, 781 (S.D.Ind. 1995); *Jobin v. Resolution Trust Corp.,* 160 B.R. 161, 171–172 (D.Colo.1993). The respondent may not rely on recitations of hearsay in affidavit form, unless it also lays out a foundation for an exception to the hearsay rule. *Churchill Bus. Credit, Inc. v. Pac. Mut. Door Co.,* 49 F.3d at 1337 and n. 6; *Miller v. Solem,* 728 F.2d at 1026.

---

**6.** To be sure, the Supreme Court noted in passing in *Celotex Corp. v. Catrett* that it did

> not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.

477 U.S. at 324, 106 S.Ct. 2548. The apparent breadth of this remark is belied by the remainder of the paragraph in which it is found, which reveals that the Court was considering whether to impose a requirement that "the nonmoving party . . . depose her own witnesses" to counter the movant. The quoted remark actually was a rejection of that option. In context, then, the observation served only to underline the rule's provision that a motion for summary judgment may "be

opposed by any of the kinds of evidentiary [sic] materials listed in Rule 56(c)," *id.,* even though affidavits and discovery responses themselves are initially barred from receipt at trial by the hearsay rule and other principles.

**7.** The relevant language is:

> Supporting and opposing affidavits shall be made *on personal knowledge,* shall set forth such facts *as would be admissible in evidence,* and shall show affirmatively that *the affiant is competent to testify* to the matters stated therein. *Sworn or certified copies* of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

(emphasis added).

In short, to resist a motion for summary judgment, the respondent must demonstrate that it will be able to get enough evidence into the record at trial before the finder of fact, to support findings on all elements as to which it has a burden of proof. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (standard in passing on motion for summary judgment mirrors standard for directed verdict under Rule 50(a) (now called motion for "judgment as a matter of law")). *See also, Celotex Corp. v. Catrett,* 477 U.S. at 322, 323, 106 S.Ct. 2548; *Reich v. ConAgra, Inc.,* 987 F.2d 1357, 1359–1360 (8th Cir. 1993); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

Thus, the lengthy and tedious exercise performed by the Defendant's counsel in her client's reply is warranted: the issue really is whether, at trial, the Plaintiff could muster the evidence to support his accusation of a malign, complex, interconnected strategy on the Defendant's part, to "effectively transfer ... [the Debtor's] profits over to" the Defendant. A recap of the Plaintiff's version of certain historical events is the best way to illuminate this issue for analysis. Then, the Defendant's theory for this motion is best framed by reciting a few uncontroverted facts about the Plaintiff's sole proffered witness.

### B. Historical Facts Urged by Plaintiff.

As the backdrop for his accusations of breach of fiduciary duty and fraudulent transfer, the Plaintiff narrates a story that would be worthy of a thriller novel based on popularized business journalism:

1. The Debtor commenced operations as an assembler and marketer of IBM-compatible personal computers in 1987. Within two years it had one of the highest sales volumes of any domestic company then in the business and personal PC market.

2. In the early 1990's, however, foreign manufacturers of PCS and their components rapidly assumed a very competitive position in the United States marketplace. This caused substantial downward pressure on prices.

3. "In approximately 1991," the Defendant began selling motherboards, the main processing components of PCS, to the Debtor. Over the two years of their vendor/purchaser relationship, the Debtor became the Defendant's largest single customer for the component; it accounted for approximately 40 percent of the Defendant's total sales in 1992, with a purchase volume five to six times larger than the Defendant's next largest customer.

4. In accordance with its general business strategy, the Defendant granted the Debtor generous lines of credit. This resulted in the Debtor running up debt to the Defendant on open account, in amounts that occasionally exceeded $3,000,000.00.

5. In 1991, the Defendant was developing a high performance disk array product that promised to be in great demand and to be very successful in its market. The release of this product was anticipated to occur in another year to two years.

6. At the same time, the Defendant's motherboard slipped in its competitiveness due to the Defendant's inability to design a product with enough performance capability to meet other technological developments in the industry.

7. The Defendant "needed to remain profitable to stay on good terms with its sources of finance" long enough to develop and release the disk array.

8. By early 1992, the Debtor's fortunes in the marketplace had changed to the point where it seemed inevitable that it would be purchased by another participant in the industry.

9. The Defendant's principals or management accordingly conceived of a way to manipulate the power that holding one of the Debtor's very largest accounts payable already gave it. The Defendant would coordinate a strategic purchase of enough

of the Debtor's publicly-traded stock to give the Defendant control of the Debtor's board of directors. It then would use that control to place its designee as the Debtor's president. Next, the Defendant would put "pressure" on that person and the Debtor generally to ensure that the Debtor continued to purchase only the Defendant's motherboards, often of obsolescent capacity, and at "exorbitant prices." It also would induce the Debtor to divert more of its revenues to payment of the Defendant's debt than to payment of its other suppliers. Between such payments and the factoring of any remaining receivable, the Defendant would preserve the semblance or actuality of its own profitability long enough for it to reach the safe haven promised by the release of the disk array.

10. After several years of courting him as a prospective management employee, the Defendant hired James Goetz as its Executive Vice President in February, 1992. Chowdry, then the Defendant's president, expressly expected Goetz to evaluate and effect "a future planned buyout of [the] Debtor." Goetz balked at taking a position with this contemplated function alone, but he accepted in the anticipation of being involved in the development and release of the Defendant's new disk array in mid–1992. Goetz then did a "due diligence" investigation of the Debtor and its operations for the Defendant in the early summer of 1992.

11. The Defendant then followed through on its plan by coordinating a purchase of approximately 51 percent of the Debtor's outstanding shares by a group of individuals or entities headed by Marjac Investments, Inc., a company controlled by Mirza. Other major participants in the investment included Chowdry, Dr. Inder Singh, Richard J. Love, and Safa Trust, Inc., another Mirza-controlled entity.

12. In turn, in the early fall of 1992, Chowdry, Mirza, Love, and Goetz were all elected to the board of the Debtor. Art Lazere, one of the Debtor's early princi-

pals, was the only board member not affiliated with the Defendant.

13. Chowdry arranged in the mid-summer of 1992 for the employment of Goetz as president and CEO of the Debtor, as had been contemplated before the "buyout." Then, in early 1993, he procured the employment of Khaled Ibrahim as chief financial officer of the Debtor.

14. Throughout Goetz's nine-month tenure at the Debtor, Chowdry induced him to continue to purchase motherboards exclusively from the Defendant, at prices that ranged from twice to more than three times what other suppliers could have offered. He also "ordered" Goetz to reduce customer prices on the Debtor's finished PCS. This, in conjunction with the high prices paid to the Defendant for motherboards, dangerously reduced the Debtor's margins.

15. Chowdry and the other Defendant-placed members of the Debtor's board "sabotaged" Goetz's effort to start mass production on a notebook computer, which the Debtor had already developed and for which it had won industry recognition. The reason was that the notebook contained no components from the Defendant.

16. Chowdry also took action to scare off at least one potential supplier of motherboards to the Defendant that would have competed with the Defendant for the Debtor's account. He did so by threatening the other supplier, that the Debtor would just not pay it on any resulting invoices.

17. As the Debtor's chief financial officer, Ibrahim took direction from Chowdry to "interfere ... with a supply agreement with Micronics, Gold Star and a lease deal with Best Buy Company, all of which were necessary to [the] Debtor's financial recovery." Ibrahim "took steps to specifically favor [the Defendant] over other suppliers" that could have provided comparable components to the Debtor. He also induced the Debtor's shipping department to deliver incomplete products on customer

orders to generate falsely-stated receivables, as a way of maintaining the asset levels required by the entities that had provided the Debtor with business financing; he concealed the receipt of a large customer payment, to divert the funds to paying the Defendant on account rather than paying the Debtor's major lender; and he instructed the Debtor's sales staff not to promote products that did not contain components from the Defendant.

18. While these "agents" of the Defendant took these actions, the Debtor continued to accumulate greater amounts of trade debt to its other suppliers; it also became increasingly unable to meet customer demand and changing technological standards in the market. After 1992, on the other hand, the price of the Defendant's publicly-traded stock "shot up due to the enormous success of the disk array products," making the Defendant's shareholders, directors, and officers "instant millionaires at the expense of the Debtor."

19. The result of all these actions was that the Debtor was cut off from any source of funding other than its line with the Defendant. Ultimately, it was left unable to maintain its parts and product inventories, staffing, or sales. By the time the involuntary bankruptcy petition was filed against it, the Debtor was no longer engaged in active assembly and marketing of the products for which it had become famous only a few years before.

### C. Undisputed Framing Facts.

So much is the story that the Plaintiff recites to support his complaint. For evidence to demonstrate his ability to prove this at trial, he relies on two things only. The first is certain documents and deposition extracts that he purports to farm in through his own affidavit. The second is the affidavit of James Goetz, with its attachments.

In its reply, the Defendant attacks the Plaintiff's proffer of much of the content of these collations. It argues that virtually none of the content that logically bears on the Plaintiff's factual theory is admissible into evidence, and that the Plaintiff has not shown that he could obtain admissible evidence to substitute for it.

To get into the merits of this multi-point, lengthy attack, it is necessary to recognize a number of uncontested facts, which go to Goetz's competency as a witness and to the probity of his statements. The Defendant actually or tacitly concedes that the following "framing facts" are established:

1. Goetz is a certified public accountant and holds an M.B.A. degree. He has had "several engineering concentrations related to computer science." [8]

2. Goetz took employment in 1976 with "NCR," where he "held positions in several corporate areas, including finance, operations and other managerial positions." From 1980 to 1985, he was employed by DataPoint Corporation, which he identifies as the "first manufacturer of the microprocessor chip." While there he held "several positions, . . . including financial planning . . . and telecommunications positions." In the late 1980s he "moved to California to help Tandon Corporation develop its personal computer business."

3. During the course of his employment from NCR on, Goetz "obtained detailed working knowledge of the workings of the personal computer industry, including the financial and technical aspects." [9]

4. While Goetz was at Tandon Corporation, Chowdry solicited him to come to work for the Defendant. In February, 1992, he accepted the position of Executive Vice President of the Defendant.

---

8. There is no evidence in the record as to the dates when he received these qualifications, or the specific nature of the last one described.

9. In his affidavit, he uses no wording that is more specific than that, as to the nature and extent of his contemporaneous education, training and experience.

5. Prior to July 22, 1992, Goetz "conducted due diligence at the Debtor" in connection with the Defendant's planned acquisition.

6. After the "Marjac Group" completed its takeover of the Debtor, Goetz's employment as the Debtor's president and chief executive officer began on August 6, 1992.

7. That month, Goetz "did a more thorough job of researching [the Debtor's] financial condition."

8. Goetz had expected to retain some sort of dual role or joint employment with the Defendant and the Debtor, in anticipation of working on the release of the Defendant's disk array product. In September, 1992, however, Chowdry told Goetz that he "was fired from any positions held with" the Defendant.

9. On April 19, 1993, Goetz tendered his resignation as president, CEO and director of the Debtor, to the other members of its board. The resignation was effective on that date.

### D. The Defendant's Evidentiary Objections, and Rulings Thereon: Goetz's Affidavit.

██ With the framing facts thus established, the admissibility of the many recitations in Goetz's affidavit can be adjudged. The discussion is best and most clearly arranged in the sequence of the affidavit, with quotations as appropriate.[10]

*Paragraph 1.* The Defendant objects to the verbiage of the second sentence of this paragraph as follows:

---

10. For the most part, the quotations will include only those portions of each paragraph that are actually the subject of objection. Surrounding text will be included where necessary for clarity, or in the case where the Defendant objected to only a portion of a sentence. All text subject to objection will be italicized.

11. Quoted in pertinent part *supra* at n. 7.

12. The text of this rule is:

A witness may not testify to a matter unless evidence is introduced sufficient to support

---

... I have personal knowledge of the facts contained herein, *including those facts relating to Mylex Corporation's ("Mylex") efforts to overcharge Debtor for personal computer motherboards, which were populated with memory and microprocessing chips, and its efforts to control Debtor for the direct benefit of Mylex.*

Goetz's conclusory statement as to his competence is not objectionable per se. To the extent that the equally-conclusory statements in the rest of the sentence have any weight, however, they are inadmissible into evidence. On the issue of whether the Debtor was ever "overcharge[d] ... for personal computer motherboards," Goetz never recites enough facts to make out a foundation for his personal knowledge. He attests to various statuses with the Debtor and the Defendant in upper-level management, including finance. However, he never states that he was involved in procurement or inventory maintenance while employed by either company, and he never says that he ever supervised these operations in a way to gain either knowledge or expertise in them. Rule 56(e)[11] and FED. R. EVID. 602[12] both require the Plaintiff to establish that Goetz was personally familiar with the subject matter of all fact averments in his affidavit, through experience or sensory perception. More crucially, fact-finding on the issue of the pricing of component parts in a large, competitive, and volatile industry is just not responsibly done absent expert testimony.[13] Goetz's affidavit is utterly devoid of

---

a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This rule is subject to the provisions of [FED R. EVID.] 703, relating to opinion testimony by expert witnesses.

13. The issue is expressly pleaded by the Plaintiff; it is just as central here as it would be in an antitrust case. No antitrust case on pricing would survive a defendant's motion for summary judgment without expert testimony. As will be seen, this shortcoming ripples throughout the Plaintiff's presentation, ulti-

any evidence to establish him as an expert on the pricing of computer chips and motherboards. The Plaintiff had the obligation to establish his qualification as such under FED. R. EVID. 702.[14] Finally, given the lack of foundation for personal knowledge, there is no foundation for a lay opinion under FED. R. EVID. 701.[15] The statement as to the Defendant's "efforts to control Debtor for [its] direct benefit ..." similarly lacks a foundation for personal knowledge. Goetz does not attest to being privy to the plot during his short tenure with the Defendant; during the alleged execution of it, he was employed by the Debtor. All of these objections are sustained, and the text may not be considered on the merits of the Defendant's motion.

*Paragraph 4.* The Defendant objects to the full text of this part of Goetz's affidavit:

> *In addition to price pressures in the industry, technological improvements were constantly being made to the efficiency of motherboard components, including memory configurations and microprocessing chip functions. My experiences during employment with Mylex and Debtor indicated that Mylex was unable to keep up with the market and produce a technologically efficient motherboard. At the same time, Mylex was not following the market by substantially lowering its prices over time, at least with respect to sales made to Debtor. Price reductions for sales made to Debtor were small in comparison to the industrywide reductions made during the relevant time period.*

Goetz's statements regarding the pace of the development of technology in the PC industry and the Defendant's lack of technological competitiveness are inadmissible for two reasons: the failure to qualify Goetz as an expert ( his cited qualifications are all financial and managerial, other than his opaque reference to "engineering concentrations"), and the lack of a foundation for personal knowledge of any specificity, even for the brief period in which Goetz was employed in sequence by the Defendant and the Debtor. His recitation regarding the Defendant's alleged failure to maintain cost-competitiveness in its product lines is inadmissible for the same reasons, though the lack of qualification-as-expert goes to the sales and procurement functions and not to engineering and product development. The affidavit fails to establish that Goetz had personal knowledge of the specific prices charged to the Debtor, prices charged generally to the Defendant's customers, and possible variances for customer-specific criteria. Thus, his statements as to the alleged inadequacy of the Defendant's price concessions to the Debtor lack foundation for personal knowledge. To the extent that the statements go to the Defendant's alleged failure to give discounts generally available in the industry, it lacks qualification for an expert opinion, and foundation for a lay opinion. On the other hand, the Defendant is *not* well-put in objecting to the "vagueness and ambiguity" of the recitations in the last two sentences of the paragraph. Though Goetz fails to identify a time-frame in the text of the affidavit, the remainder of the affidavit and the Plaintiff's fact pleading frame the broader and broadest

mately depriving it of an essential element of his fraudulent-transfer theory.

**14.** The text of this rule is:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness *qualified as an expert by knowledge, skill, experience, training, or education,* may testify thereto in the form of an opinion or otherwise.

(emphasis added).

**15.** The text of this rule is:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

contexts for its meaning. An objection on the grounds of "vagueness and ambiguity" really does not even go to the admissibility of the text of an answer (as opposed to the propriety of a question); to the extent it can, this one is overruled. All of the other objections must be sustained, however, which means this text is banished from consideration.

*Paragraph 5.* The Defendant objects to the italicized verbiage in Paragraph V:

> With respect to the supply relationship between Mylex and Debtor, *Mylex began making sales of motherboards to Debtor in approximately 1991,* and such sales continued throughout most of 1993. Total sales by Mylex to Debtor during 1992 and the early part of 1993 exceeded $20 million dollars. *Debtor should have received large discounts from Mylex due to its large volume purchases. Debtor was initially offered a substantial credit line, and ran up large bills with Mylex, which exceeded three million dollars at times. At the same time, however, Mylex was charging exorbitant prices to Northgate for the sale of motherboard components, while Debtor could easily have purchased comparable or even superior products from competitors of Mylex at roughly 30–50% of the price charged by Mylex. Based upon the total sales to Debtor in 1992 and 1993, Mylex substantially overcharged Debtor for motherboards by an amount of at least $6,000,000.00 to $10,000,000.00.*

To the extent that these recitations go to any event at the Defendant other than those during the period between February and September, 1992, or at the Debtor other than those during the period between August 6, 1992 and April 19, 1993, Goetz has not made a foundation for personal knowledge; he simply was not employed by them before or after those periods. The vagueness of the proffered statement in the fourth sentence, and its failure to link its content in time to the only period for which Goetz *could* have had personal knowledge, deprive it of a

foundation for relevance. Finally, because they lack foundations for personal knowledge and for lay opinion and for a qualification as expert witness, the recitations regarding the "large discounts" that "should have [been] received" and the alleged exorbitance of pricing are inadmissible. The failure to even attest to the dollar-value of the Defendant's total sales to the Debtor makes the conclusory recitation of the "substantial[ ] overcharge[ ]" in 1992–1993 inadmissible for lack of foundation. All of the Defendant's objections are sustained, and the subject content of this paragraph is ousted from the record.

*Paragraph 6.* The Defendant objects to the following portion of Paragraph 6:

> ... *In part, Dr. Chowdry's motivation in recruiting me was to assist Mylex in a future planned buyout of Debtor. He knew that I had a good working relationship with the owners of Debtor, and that I had twice before attempted to negotiate a buyout of Debtor for Tandon Corporation.*
>
> ...

This verbiage lacks a foundation for personal knowledge: Goetz certainly was never inside Chowdry's head, and absent some recitation that Chowdry ever communicated these things to Goetz, with the form and time of the communication, there is nothing to establish that Chowdry ever harbored the motivations. This objection is sustained and these sentences are barred from consideration.

*Paragraph 7.* The Defendant objects to the following parts of Paragraph VII:

> ... *In 1992, I realized that Mylex had several problems related to its inability to design and manufacture a competitive motherboard product.* Intel Corporation has exercised much control over the design of motherboards due to its developing dominance in the computer chip industry. *Mylex was unable to design motherboards with components that would meet the market's demand for high performance. Essentially, Mylex needed a new product. The disk*

*array product provided such a new product, but would not benefit Mylex until at least the summer of 1993. In the meantime,* Mylex needed to remain profitable to stay on good terms with its sources of finance. *It now has become apparent that Debtor became an integral part of Mylex' plans to stay profitable while waiting to cash in on the disk array product.*

Again, Goetz's remarks regarding the Defendant's design and manufacturing capability lack foundations for personal knowledge and for a lay opinion, and qualification as an expert. His references to the potential benefit to the Defendant from its development of the disk array product lack foundation for personal knowledge. Because the earlier four sentences must be excised from the evidence, the phrase "in the meantime" lacks relevance. The last sentence's accusation—that the Defendant planned to cannibalize the Debtor's value for its own survival—lacks a foundation for Goetz's personal knowledge as to the need, the motivation, *or* the plan; there is no statement that he was ever privy to the hatching or development of the alleged scheme, or any other detail as to how he drew his conclusions about its existence.[16] These objections are sustained, and the subject text is excised from the record proof of the Plaintiff's claims.

*Paragraph 8.* The Defendant objects to the indicated content of this paragraph:

By 1992, it became clear that someone would acquire Debtor, although the ultimate purchases had not yet been determined. *This was of great concern to Mylex, since Mylex depended upon Debtor for approximately 40% of its sales. At the time, Debtor purchased at least 5 to 6 times more product from Mylex than Mylex' second largest customer. Debtor's volume purchases should have allowed Debtor to purchase motherboards at prices much lower than prices paid by other Mylex customers. Significantly, Mylex' sale of motherboards to Debtor also allowed Mylex to continue financing the development and refinement of the disk array product, which was not expected to reach the market place until the summer of 1993. When I agreed to come on to Mylex as its executive vice president, however, I was led into believing that the disk array product would be ready for market in the summer of 1992.* Several potential buyers of Debtor existed in 1992, including Mylex.

There is no foundation for Goetz's personal knowledge as to the Defendant's dependence on the Debtor's patronage to maintain its overall sales volume—either generally (there is no showing that Goetz had any specific knowledge of the Defendant's sales volume or any component of it) or on a basis more limited in time (for any period before or after Goetz's employment with the two companies). Again, Goetz's statements that the Debtor should have been able to compel price concessions from the Defendant lack foundation for personal knowledge or lay opinion, and qualification for an expert opinion. Finally, his statement that maintaining the volume of sales to the Debtor was an artifice to facilitate the development of the disk array assumes facts not in evidence (*i.e.,* that the Defendant actually had a need for cash to finance the development), and lacks foundation for personal knowledge for any period before February, 1992 or after September, 1992. The Defendant's relevancy objection to the sixth sentence (Goetz's belief that the disk array product would be readied in mid–1992) is overruled, however; the point certainly is circumstantial evidence that bears on the existence of the

---

**16.** Even if the accusation were admissible, the Plaintiff's failure to produce *any* independent corroborating evidence give it a vanishingly small weight anyway. One is left to conclude that Goetz bases it on little more than his observations of the Defendant's hard-nosed approach to pricing, and the Debtor's relative prominence in the Defendant's customer base.

alleged scheme in at least a minor way. In all other respects, though, the Defendant's objections to text in this paragraph are sustained, and the subject language is barred from consideration.

*Paragraph 9.* The Defendant objects to the full text of this paragraph:

*In late June of 1992, Everex Corporation, a Taiwanese company, beat Mylex to the punch, and entered into a letter of intent to purchase Debtor. However, the stock market's reaction to the announcement of the buyout had such a negative effect on Everex's stock, that Everex attempted to back out of the deal. Knowing that whoever ultimately purchased Debtor would likely become the sole supplier of components to Debtor, Dr. Chowdry immediately acted upon learning of Everex's pullout, by attempting a purchase of Debtor that would benefit Mylex. He successfully did so through the assistance of individuals and entities that were at that time officers, directors, shareholders and employees of Mylex. The lead investor was an entity known as Marjac Investment, Inc. ("Marjac"). Marjac was a large shareholder of Mylex, and was controlled by Dr. M. Yaqub Mirza, who was at the time, and continues today, as a Mylex director and shareholder. Some of the largest investors behind the Debtor buyout included Dr. Chowdry, Dr. Inder Singh, Richard J. Love and two companies controlled by Dr. Mirza, Safa Trust, Inc. and Marjac Investment, Inc. The buyout was completed on July 22, 1992.*

Goetz gives no foundation for his personal knowledge as to any aspect of Everex Corporation's alleged overture, from its initial interest to its retreat. The references to the causative effect of the "announcement of the buyout" on Everex's stock value are inadmissible, for lack of foundation for a lay opinion and for assuming facts not in evidence (the mere occurrence of the drop in value, and details on it), for lack of foundations for personal knowledge and for lay opinion, and for lack of qualification of Goetz as an expert on the issue of causation. There is no foundation for Goetz's personal knowledge of Chowdry's alleged reaction to the withdrawal of the Everex overture; Goetz *may* have been doing "due diligence" for a possible acquisition of the Debtor as early as that time, but he never even states that Chowdry made him privy to his observations, reactions, and plans in consequence. The recitations as to the identity of the alleged participants in the "purchase of Debtor," and particular individuals' or entities' prominence, similarly lack a foundation for personal knowledge: Goetz may well have had access to the Debtor's shareholder records before the stock purchases, and probably had it after he was hired by the Debtor, but he never makes the simple statement that he did, for either time. Leonard's affidavit farms in a copy of a Securities and Exchange Commission Schedule 13D, apparently filed in connection with the "takeover," which Mirza signed on behalf of Marjac Investments, Inc. "for itself and [others acquiring shares in the Debtor] as Attorney–in–Fact." Though Goetz is named on the first page of this document as "Person Authorized to Receive Notices and Communications," he never states that he has ever even seen it.[17] Finally, the affidavit lacks an adequate foundation for personal knowledge as to the allegedly-pervasive interrelationship of the new shareholders and the Defendant. Goetz does not name individuals or corporate investors other than the common officers, directors, or shareholders who show on the documents farmed in by Leonard's affidavit. The SEC Schedule 13D, however, shows that those individuals personally took a minority fraction of the

---

17. The identification of purchasers and numbers of shares in the SEC Schedule 13D flatly contradict Goetz's affidavit statement that Marjac was the "lead investor," at least from the standpoint of a percentage of shares nominally acquired. This suggests that Goetz's statement was speculative. In any event, it highlights its lack of foundation.

shares sold in the "takeover"; on its face, it does not evidence any connection of employment or investment between the Defendant and the rest of the new shareholders.[18] There is no specific foundation for personal knowledge as to Mirza's status as to either Marjac or the Defendant. On the other hand, Goetz *is* competent to testify to the final statement, regarding the completion of the "buyout" on July 22, 1992; he certainly was involved. The sustaining of the balance of the Defendant's objections, however, leaves the fourth and the last sentences as the only ones standing in Paragraph 9.[19]

*Paragraph 10.* The Defendant objects to most of the content of this paragraph:

> *Many employees of Mylex were "forced" to invest substantial funds in the buyout of Debtor or lose their jobs.* I personally saw many of the Mylex employee stock subscription agreements for Debtor's stock. In one particular case, Art Lazere, owner and founder of Debtor, sent me a memoranda [sic] on January 14, 1993, *regarding a Mylex employee with an Asian Indian accent that contacted him with respect to his "investment" in Debtor. See attached Exhibit A. The Mylex employee explained that Dr. Chowdry forced him and several other Mylex employees, many of them Indian immigrants like himself, to invest in Northgate, or they would "not have a future with Mylex." The Mylex employee further explained that Dr. Chowdry told Mylex employees that "Northgate will bring upwards of $5 Million a month to Mylex and that*

> *Northgate will not buy produce (sic) except from Mylex."*

Much of this verbiage accuses the Defendant's management of press-ganging its own employees into financially underwriting the first stage of the alleged scheme. The questionable relevance of this content aside,[20] the statements utterly lack a foundation for personal knowledge. Exhibit A-and the summary of it in Goetz's recitation-are double- and triple-level hearsay; Goetz does not lay a foundation for any of the exceptions to the hearsay rule under Fed. R. Evid. 803–804 as to any of the levels, and the Plaintiff does not proffer a theory of admissibility for the way in which they are presented now. All of the Defendant's objections are sustained, and the subject wording is excised from the record.

*Paragraph 11.* The Defendant objects to half of the content of Paragraph 11:

> *It was decided early on, and prior to the buyout, that Mylex would appoint me to take over Debtor upon its sale to the Marjac Investment, Inc. group, and this decision was known to Art Lazere prior to the completion of the buyout.* I conducted due diligence at Debtor prior to July 22, 1992, and learned that a large capital infusion was necessary to continue its operations and get back to profitability.

Both halves of the first sentence are phrased in the passive voice, which is a dodge around an overt presentation of hearsay. This attempt to avoid one problem creates another: if someone other than Goetz made or participated in the decision, and then informed Lazere, there

---

**18.** The weakness of the record may reflect some notion of leading the Court into ignoring the apparent status of the majority of the new investors to concentrate on those most clearly connected to the Defendant. This observation may not be entirely fair, but it certainly follows logically from the record that the Plaintiff put forth.

**19.** The striking of the first three sentences leaves the fourth sentence's reference "[h]e did so" out of context, and without meaning

as it stands alone. For the sake of the later analysis, one can assume that "he" refers to Chowdry, and "did so" to the summer 1992 stock purchase.

**20.** The Plaintiff offers no specific reason why this evidence is relevant to any of his requests for relief. At most, these statements are bits of circumstantial evidence for the Plaintiff's "actual fraud" and equitable-subordination theories.

is no foundation for Goetz's personal knowledge that those acts were performed. Because the author of the affidavit eschewed the active voice, one can only conclude that this was the case. This renders the sentence inadmissible. Had Goetz simply attested to his "understanding," even in a general way, the objection would not have presented itself. The first sentence is banned from the record for substantive consideration.

*Paragraph 12.* The Defendant then objects to one sentence of this paragraph:

In August of 1992, after the sale of Debtor had been completed, I did a more thorough job of researching its financial condition and found a large dollar amount of write-offs, including inventory and receivables. *I understood that my role as interim president and CEO was to assist Debtor into going private.* Initially, I planned to retain my position with Mylex, and only expected to serve in a role at Debtor for a limited period of time.

The objection here is that the phrase "going private" is vague. The phrase, however, is commonly understood in a general sense, although applied to a variety of transactions involving changes in corporate ownership. This objection is without merit, and is overruled.

21. The relevant text of this rule is:
 (d) **Statements Which are Not Hearsay**. A statement is not hearsay if—
 . . .
 (2) *Admission by Party–Opponent.* The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or service concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish the declar-

*Paragraph 14.* The Defendant next objects to the following text, part of Goetz's recitation of events at a meeting of the Debtor's board of directors on September 14, 1994:

I was shocked at that meeting ... *when Dr. Chowdry informed me that I had no employment agreement with Debtor, and that he essentially was reneging on any such agreements, even though Dr. Chowdry was not a member of the Debtor's board of directors at the time.*

This, of course, is hearsay. The Plaintiff makes no proffer to support its receipt as a party admission within the scope of FED. R. EVID. 801(d)(2).[21] It does not qualify as a present sense impression under the exception of FED. R. EVID. 803(1);[22] Goetz is not describing an "event or condition," but rather quoting Chowdry—and as much as he may have been shocked at Chowdry's statement he is not quoting something said out of that shock. The objection is sustained, and subject text cannot be considered as evidence for summary judgment purposes.[23]

*Paragraph 15.* The Defendant objects to the last two sentences of this paragraph:

... *My efforts at returning Debtor to profitability through the new notebook*

ant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

22. The relevant text of this rule is:
 The following are not excluded by the hearsay rule ...:
 (1) **Present Sense Impression.** A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

23. The spontaneity of such reactive "impressions" carries the "circumstantial guarantee of trustworthiness" that supports the existence of the exception.

*product, however, were sabotaged by Mylex, through Dr. Chowdry primarily, since at that time the notebook product contained no Mylex component parts. In my numerous conversations with Dr. Chowdry, he was adamant that Debtor would not build products that did not contain components purchased from Mylex.*

As a general matter, Goetz does not make out a foundation for his personal knowledge as to the alleged "sabotage" of the notebook-computer product.[24] Goetz attributes "adamance" to Chowdry, but the attribution fundamentally is a blunt use of hearsay without reference to any basis for an exception. The Plaintiff does not offer Chowdry's statements as a party admission. This proffer, then, shows the same ambiguity as runs throughout Goetz's affidavit: was Chowdry speaking as an employee or agent of the Defendant, as an influential member of the Debtor's board, or both? Goetz does not even attest to his own understanding on that point, let alone Chowdry's.[25] The Defendant's objections are sustained, and these sentences are trimmed from the record.[26]

*Paragraph 16.* The Defendant objects to almost all of the content of this paragraph:

In late October of 1992, specifically, Dr. Chowdry came to Minneapolis to meet with me regarding prices and sales of computer products containing Mylex

motherboards. *Even though Mylex products were nearly twice the price of its competitor's prices, Dr. Chowdry insisted that Debtor pay these prices. Dr. Chowdry set all prices that Mylex charged Debtor, and such prices were nonnegotiable. In conjunction with the setting of high prices for Debtor's motherboard supply, Dr. Chowdry also ordered me to reduce Debtor's prices charged to Debtor's customers to increase sales of products containing Mylex components. In effect, this would cause Debtor to effectively transfer its profits over to Mylex.*

Again, as to the alleged exorbitance of the Defendant's prices to Debtor, Goetz has not made out a foundation for his personal knowledge or for a lay opinion, and has not qualified himself as an expert on pricing. Neither has he made out a foundation for his personal knowledge as to the Defendant's rules for pricing of components sold to the Debtor; he was not an employee of the Defendant in or after October, 1992, and this paragraph is logically read to refer only to that time-frame. Given the inadmissibility of the preceding two sentences, the phrase "in conjunction with the setting of high prices for Debtor's motherboard supply ..." is irrelevant; it also assumes facts not in evidence. The balance of that sentence is hearsay, for which there is no asserted basis for an exception,

**24.** Aside from the general lack of foundation, there is a small technical gap in the logic of the underlying thought. The only act or event that Goetz cites as "sabotage" is Chowdry's alleged refusal to "permit" the Debtor to manufacture consumer products without components made by the Defendant. However, he never overtly states that the Defendant did not make components compatible with the notebook.

**25.** To be entirely fair to the Plaintiff, one must acknowledge that the ambiguity is the whole point of his reliance on a breach-of-fiduciary-duty theory.

**26.** The subject matter of this paragraph raises another pointed issue, which goes more to the merits: if the major purpose of the scheme was to milk the Debtor of liquid cash for the

development of the disk array, would it not have served the Defendant's purposes better to have the Debtor market a successful new product? This could have enabled the Debtor to generate new revenues, to support even greater purchases of the Defendant's motherboards for its regular line. It also well could have avoided the pileup of a huge receivable like the one the Debtor owed the Defendant when it was put into bankruptcy. The counter, one supposes, is to attribute even greater malignity to the Defendant: to bleed the Debtor utterly dry, but slowly enough that the Defendant's loss on the receivable was outweighed by its gain on the disk array. Unfortunately, the mystery posed here will not be illuminated at a trial.

and it lacks a foundation for personal knowledge as to the purpose of the directive to "reduce Debtor's prices." The last sentence is inadmissible for lack of foundations for personal knowledge and for a lay opinion and lack of qualification for an expert opinion.[27] The Defendant's objections are sustained, and the indicated words are excluded from the evidence.

*Paragraph 17.* This paragraph makes reference to a supply agreement between the Defendant and Debtor, allegedly presented to Goetz in September, 1992, though never executed by either party. The Defendant objects to the following statement regarding the agreement:

> *The supply agreement was very one-sided in favor of Mylex, and included outrageous terms that gave Mylex the right to sit on Debtor's board and have visitation rights.*

To the extent it is offered to prove the content of the agreement or any part of it, this statement is inadmissible; the original agreement, pursuant to FED. R. EVID. 1002,[28] or a duplicate pursuant to FED. R. EVID. 1003,[29] were the only competent evidence as to the agreement's content, absent proof of one of the exceptions of FED. R. EVID. 1004.[30] Goetz offers nothing to support any of those exceptions. In addi-

tion, to the extent that the statement contains opinions, Goetz has not provided a foundation for a lay opinion, nor qualified himself as an expert on the acceptability of any terms that the agreement contained. The objections again are sustained, and the sentence is exiled accordingly.[31]

*Paragraph 18.* The Defendant objects to the full content of this paragraph:

> *Throughout the winter of 1992 and 1993, Mylex was exerting extreme pressure on Debtor to continue purchasing mother boards at above market prices. Even though the supply agreement was never signed, Debtor's employees were forced to continue buying overpriced mother-boards from Mylex due to instructions and threats of being fired from the Mylex officers and directors that sat on Debtor's board.*

Most of the paragraph's text is not admissible, but a portion is. The Defendant objects to the assertion that the Defendant continued to exert "extreme pressure on Debtor" as phrased vaguely. It is. However, Goetz certainly is competent to testify to his general perception of the business relationship between the Defendant and the Debtor during the stated time, even in a factually-"conclusory" fashion,

---

**27.** It is also conclusory and argumentative, though these characteristics go more to weight than to admissibility.

**28.** This rule provides:

> To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.

**29.** This rule provides:

> A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

**30.** This rule provides:

> The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if—

(1) **Originals Lost or Destroyed.** All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or

(2) **Original Not Obtainable.** No original can be obtained by any available judicial process or procedure; or

(3) **Original in Possession of Opponent.** At a time when an original was under the control of the party against whom offered, that party was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the hearing, and that party does not produce the original at the hearing; or

(4) **Collateral Matters.** The writing, recording, or photograph is not closely related to a controlling issue.

**31.** In any event the vagueness of the characterization-what, indeed, "was very one-sided"?-would deprive the statement of any significant probative value, even if it were admissible.

and the content is relevant to the Plaintiff's pleaded theories of recovery. The reference to the purchases being "at above market prices," however, is as deficient in foundation and qualification as all earlier references on the issue of pricing. In the second sentence, the initial clause, while cumulative, is not objectionable. The remainder of the sentence, however, lacks a foundation for personal knowledge. In addition, the overly-clever phrasing-probably designed to cast it as a sensory impression-does not obscure the fact that this statement could be predicated only on condensed, but potentially broad, hearsay-which is presented without foundation for an exception. The Defendant's objections, then, are sustained in part and overruled in part; of this paragraph, only a portion remains in the record.

*Paragraph 19.* The Defendant objects to almost all of the text of the first three sentences of this paragraph:

In December of 1992, Dr. Chowdry made a specific visit to Minnesota *to apply pressure on me seeking to have Debtor make payments to Mylex on accounts receivables owed to Mylex. The prices for Mylex motherboards were set by Dr. Chowdry even though he occasionally paid lip service to the interest of Debtor in not paying above market prices. Especially in documents, and at formal meetings, Dr. Chowdry did a good job at pretending to act in the best interests of Debtor, while in private, took actions that crippled Debtor.* During one such private conversation with me, Dr. Chowdry and I were discussing the necessary financing for Debtor's operation, and Dr. Chowdry's promises to find additional financing. When I complained about high prices for Mylex products that were severely diminishing cash flows, Dr. Chowdry said "it's your problem about the prices, go find other money." Dr. Chowdry had previously threatened, in November of 1992, that he would not make efforts to raise additional capital for Debtor if I refused to play ball with him and go along with his

efforts to charge Debtor exorbitant prices for motherboards. On this as well as other occasions, Dr. Chowdry threatened that I would be fired if Debtor did not purchase Mylex products at the prices set by Dr. Chowdry.

Goetz, of course, is competent to testify to Dr. Chowdry's presence in Minnesota as long as he personally observed it. He has not made out a foundation for personal knowledge as to the motivation for the visit, however. Also-and again—the phrasing of the remainder of the first sentence is designed to hide the character of the content as hearsay presented without a foundation for an exception. The second sentence lacks a foundation for personal knowledge. The third sentence amounts to nothing more than a conclusory, *ad hominem* accusation; absent statements establishing that Goetz personally observed the "actions that crippled Debtor," the statement lacks a foundation for personal knowledge. The Defendant's objections are sustained, and the identified statements are wiped from the record for substantive purposes.

*Paragraph 20.* As to the narrative recitations in this paragraph, the Defendant objects only to its reference to Mirza calling Goetz "to apply pressure on [him]." As it is presented, the phrase does indeed lack a foundation for personal knowledge as to Mirza's motivation. The Defendant's greater objection, however, is to this paragraph's main use, to farm in "a verbatim transcript" of a telephone conversation that Goetz alleges he had with Mirza. The "transcript" is inadmissible for numerous reasons: it is double-level hearsay, without proffered foundation for an exception as to either level; it lacks foundation for the accuracy of the transcription, and hence is not authentic; and it certainly is not the original recording, which FED. R. EVID. 1002 required the Plaintiff to produce for the record absent a foundation under FED. R. EVID. 1004 for the alternative form of

the content.[32] The Defendant's objections are sustained; the reference and the transcript are abscised from the record.

*Paragraph 21.* The Defendant objects to most of the content of Paragraph 21:

> In February of 1993, *Mylex took additional steps to exert pressure and control over Debtor by directing that* Khaled Ibrahim, formerly the vice president of finance of Mylex, become the CFO of Debtor. *While at Northgate, Mr. Ibrahim interfered with a supply agreement with Micronics, Gold Star and a lease deal with Best Buy Company, all of which were necessary to Debtor's financial recovery.* Mr. Ibrahim also took steps to specifically favor Mylex over other suppliers. *See attached as Exhibit E a verbatim transcript of my taped notes for February 24, 1993, April 12, 1993, and April 19, 1993.*

Again, Goetz's statement that the Defendant "direct[ed]" Ibrahim's hiring lacks foundation for personal knowledge; Goetz was not employed by the Defendant at that time, and he does not attest to how he learned the content of this statement. The second sentence, going to Ibrahim's alleged machinations while in the Debtor's employ, similarly lacks a foundation for personal knowledge.[33] Finally, Goetz's summary citation in the last sentence completely fails as a foundation to farm in the transcriptions of his "tape notes." The statements themselves are unquestionably hearsay within the definition of FED. R. EVID. 801(c). There is no foundation for

the "recorded recollection" exception of FED. R. EVID. 803(5),[34] because there is no recitation that Goetz taped the original statements at or soon after the subject events. In any event, the written transcription could only be received "as an exhibit" on proffer by a party *adverse to* the Plaintiff. Lastly, the transcriptions do not meet the "requirement of original" under FED. R. EVID. 1002, and Goetz does not make out a foundation for an exception under FED. R. EVID. 1004. The Defendant's objections are sustained; the references and these "transcripts" are expurgated from substantive consideration.

*Paragraph 22.* This paragraph deals with an aborted attempt by the Debtor to contract for component parts with Micronics Computers Inc., in competition with the Defendant. Though the Defendant has not objected to the second sentence, it is unquestionably hearsay, proffered without a foundation for an exception:

> Steve Kitrosser of Micronics agreed to sell motherboards that were superior in performance to the Mylex motherboards, and to extend $500,000.00 in a line of credit to Debtor for the purchase of such motherboards.

The Defendant does object to the third and fifth sentences of the paragraph:

> *Mr. Kitrosser, however, was approached by Dr. Chowdry at a trade show in Europe and said that Micronics would never receive any payments for any motherboards supplied to Debtor due to Mylex's control and influence over*

---

32. The strength of these objections makes it unnecessary to consider the Defendant's argument that the Plaintiff is estopped from offering this evidence because his responses to the Defendant's discovery requests did not disclose it in either form.

33. The conclusory accusation of "interference" would deprive the sentence of most of its probative value, were it facially admissible.

34. The relevant text of this provision is:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 . . .

(5) **Recorded Recollection.** A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

*Debtor. See memo to my file, attached as Exhibit F.* The prices for motherboards offered by Micronics were substantially lower than the prices charged by Mylex for motherboards. *When Mr. Ibrahim arrived in February of 1993, he also took steps to prevent the purchasing department from buying product from Micronics.*

The third sentence presents double-level hearsay; Goetz's memorandum "to [his] file" adds another level onto the stack; and there is no proffer of a foundation for an exception as to any of the levels on either form of evidence on this point. Finally, the last sentence is inadmissible for lack of foundation for personal knowledge; though Goetz was employed by the Debtor at the time, there is no statement as to how he gained the factual basis for his vague and conclusory accusation. The Defendant's objections are sustained; their subject, and the hearsay additionally noted, are ablated from the evidence.

*Paragraph 23.* The Defendant objects to this full paragraph:

*There are many specific instances in which I personally learned that Mr. Ibrahim committed actual fraud by enlisting the vice-president of shipping to ship products to customers without all component parts int hem. The scam involved showing our financing companies, including CIT, that sales had been made, and obtaining money from the financing company pursuant to the factoring arrangements. Once additional funds were received from the financing institution, the missing component parts could then be shipped to the customer. The vice president of shipping that was enlisted by Mr. Ibrahim was Steven Ramsland, who quit shortly after being approached by me with respect to this fraudulent arrangement. See attached Exhibit G.*

The accusation of commission of "actual fraud" in the first sentence goes directly to a legal conclusion, and hence is inadmissible. The foundation for personal knowl-

edge as to the remainder of the paragraph is almost non-existent. Ultimately, however, there is no argument advanced for the materiality of the content: even if Ibrahim bilked the Debtor's customers for the Debtor's benefit, the Plaintiff does not offer a logical link to the question of whether the Defendant bilked the Debtor for the Defendant's benefit. Exhibit G is inadmissible for lack of foundation for personal knowledge as to its factual content; in addition, the letter is shot through with repetitions of hearsay, and the Plaintiff does not offer any of the exceptions of FED. R. EVID. 803–804 for any level of the hearsay. Again, the Defendant's objections are sustained, and the statements in question are debrided from the evidence.

*Paragraph 24.* The Defendant objects to a portion of this paragraph:

From January to April of 1993, I prepared several letters to the board of directors with respect to Mr. Ibrahim's handling of financing issues and essentially eliminating our available sources of financing. *One of those letters is attached as Exhibit G.* While serving as president and CEO of Debtor, I have personally learned that *Mr. Ibrahim also instructed Debtor's sales people not to sell any products other than those that contain Mylex components.* I also found a large payment, of at least several hundred thousand dollars, that came in March of 1993 from a leasing company. *Mr. Ibrahim hid this large payment from our bank, in breach of our loan agreements, and was able to direct that the funds be paid to Mylex. The existence of this payment became known to the bank within several weeks, thus destroying another source of financing.*

For the reasons just noted, Exhibit G is inadmissible; hence, the reference to it lacks relevance. Goetz's statements as to Ibrahim's alleged instructions to the Debtor's sales staff are double-level hearsay, proffered without foundation as to a single potential exception for either level. His statements as to Ibrahim's alleged subter-

fuge against the Debtor's commercial lender lack foundation for personal knowledge; his conclusion that Ibrahim's actions "destroy[ed] another source of financing" especially lacks such a foundation. These objections must be sustained; the subject content is subducted from the record.

*Paragraph 25.* The Defendant objects to virtually all of the content of this paragraph:

> *The steps taken by Dr. Chowdry, Khaled Ibrahim, and others to interfere with Debtor's ability to obtain financing and maintain sound lending relationships placed Debtor in the precarious position of being forced to work only with Mylex to obtain supplies for its products, since nobody else in the industry would provide Debtor with financing.* Mylex, however, was willing to extend several million dollars in trade credit financing to Debtor, so long as Debtor paid Mylex *exorbitant prices* for motherboards. *Even if Mylex didn't get paid in full by Debtor, Mylex still benefitted from such sales, since Mylex in turn could factor its receivables, and keep afloat while it was completing its development of its disk array product. The strategy has apparently worked well for Mylex, since my review of the financial pages shows that Mylex stock prices shot up due the enormous success of the disk array products. The Mylex shareholders, directors and officers became instant millionaires at the expense of Debtor.*

In general, Goetz's portrayal of a Debtor relegated to utter dependence on the Defendant lacks a foundation for personal knowledge; as before, Goetz does not show how, from whom, and in what capacity he learned all of the intertwined subsidiary facts needed to support such a conclu-

sion.[35] The reference to the exorbitance of prices in the second sentence lacks foundation and qualification as did all other references on the pricing issue. The content of the third sentence lacks a foundation for personal knowledge and for a lay opinion, as well as qualification for an expert opinion. In addition, it is really presented as a hypothetical, rather than a statement of objective fact; it is speculative; and it is rather shrilly argumentative. The Plaintiff is not utterly out of bounds in trying a shortcut to prove up the rise in Mylex's stock prices, as the factual content of published stock prices is admissible under FED. R. EVID. 803(17).[36] However, this exception only saves *the original published form* from objection, and Goetz's very general observation in the fourth sentence fails the best-evidence requirement of FED. R. EVID. 1002, for want of any of the exceptions of FED. R. EVID. 1004. Goetz's statements on the alleged success of the strategy, or its benefit to the Defendant's principals and shareholders, lack foundation for personal knowledge-and to the extent they constitute an opinion, they lack foundation for the lay sort and qualification for the expert sort. The Defendant's objections as to this paragraph are sustained, and all but the nonobjectionable part of its second sentence is excerpted from the evidence.

### The Defendant's Evidentiary Objections, and Rulings Thereon: The Plaintiff's Affidavit

The Defendant has also objected to one set of recitations in the Plaintiff's affidavit, and to two of the sets of exhibits to it. These objections are well-founded.

---

**35.** Even were the statement admissible, two other circumstances would reduce its weight to that of a conclusory accusation: the inadmissibility of earlier statements regarding the destruction of the relationship with the Debtor's commercial lender, and the lack of any recitation as to efforts to find financing elsewhere.

**36.** The text of this hearsay exception is:

> **(17) Market, Reports, Commercial Publications.** Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations.

*Paragraph 2.* In this paragraph, the Plaintiff attests to meeting with Goetz on August 26, 1997, and receiving various documents at or after that meeting. The Defendant objects to the following recitation:

> *In addition, [Goetz] promised to send me a tape he recently located of a conversation he recorded between himself and Dr. M. Yaqub Mirza, a transcript of which is attached to Goetz' affidavit as Exhibit D. I received that tape, via Certified Mail, approximately one week later. Sometime in mid-September, 1997, I received a second tape from Mr. Goetz, which contained his taped notes from early 1993. A transcript of the second tape is attached to Goetz' Affidavit as Exhibit E.*

This recitation does not establish foundations for either of the exhibits, because the Plaintiff is not competent to attest to the *content* and authenticity of either the tapes or the proffered transcripts. Nor does it overcome any of the objections earlier sustained in the discussion on Goetz's affidavit. Because the exhibits themselves cannot be admitted on the present record, the Plaintiff's references to them are irrelevant. The Defendant's objection is sustained, and the quoted text is excised from the evidence.

*Paragraph 6 and Exhibit D.* Paragraph 6 of the Plaintiff's affidavit reads as follows:

> *Attached as Exhibit D are true and correct copies of pages 39–40 of the Deposition transcript of Khaled Ibrahim, dated December 20, 1994.*

The Defendant objects to the exhibit because, as submitted, it is not a complete copy of the transcript of the deposition of Ibrahim, and the Plaintiff failed to furnish a complete copy after it objected to the incomplete copy. This objection is founded on Fed. R. Evid. 106.[37] It must be sustained pursuant to the rule's plain language; the Defendant had the right to demand and obtain a full copy for the record, so any questions about the meaning of the excerpts *in context* could be addressed. The Defendant also objected to lack of authentication. This, too is an appropriate objection. The excerpt consists only of the two cited pages, and a title page captioned in the Debtor's Chapter 11 case. The latter does not even identify the attorney-attendees at the deposition. In view of this objection, the failure to provide a full copy with the court reporter's certification is doubly fatal. Both of the Defendant's objections are sustained, and the subject text and the exhibit will not be considered as evidence for this motion.

## F. Sustaining of the Defendant's Evidentiary Objections: The Result.

The Defendant's objections to the evidentiary record in the Plaintiff's response, then, are sustained as noted. The result leaves the Plaintiff relying on only two things. The first is an affidavit from Goetz that is much-truncated.[38] The second is a documentary record farmed in under the Plaintiff's affidavit that consists of the following:

> *Exhibit A:* Copy of Schedule 13D, Securities and Exchange Commission, for the Debtor, dated July 22, 1992, identifying various investors in the Debtor, including those alleged by the Plaintiff to "have a relationship with" the Defendant.

---

**37.** The text of this rule is:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

**38.** Goetz's affidavit, as redacted, is attached to this order as Exhibit A. It scarcely would be fair to expect the parties, readers, and any reviewing courts to each make its own. One cannot effectively follow the analysis under the standards for summary judgment without a redacted affidavit at hand.

*Exhibit B:* One-page chart, undated, "prepared by" the Defendant, identifying its officers.

*Exhibit C:* Copy of proxy statement for Defendant's 1992 annual shareholders' meeting, dated July 27, 1992, identifying its officers and directors.

*Exhibit E:* Copy of minutes of meeting of Debtor's board of directors, dated August 6, 1992.

*Exhibit F:* Copy of minutes of meeting of Debtor's board of directors, dated September 14, 1992.

*Exhibit G:* Copy of minutes of meeting of Debtor's board of directors, dated October 16, 1992.

*Exhibit H:* Copy of minutes of meeting of Debtor's board of directors, dated December 14, 1992.

*Exhibit I:* Copy of minutes of meeting of Debtor's board of directors, dated February 15, 1993.

*Exhibit J:* Memorandum from Luke Komarek, Debtor's counsel, to Goetz, dated August 17, 1992, acknowledging Goetz's resignation as officer and employee of the Defendant.

*Exhibit K:* Portions of transcript of deposition of Patrick Brennan, dated June 12, 1996.

*Exhibit L:* Copy of the Defendant's price quotations for computer components to the Debtor for fourth quarter 1992.

*Exhibits M and N:* Copies of the Defendant's price quotations for computer components to the Debtor for first and second quarters, 1993.

*Exhibit O:* Memorandum from Micronics Computers, Inc. to the Debtor, with price quotation on motherboards, dated February 16, 1993.

*Exhibit P:* Copies of the Debtor's audited financial statements for years ending January 1, 1994; January 2, 1993; and December 31, 1991.

These items are the only evidentiary materials of record to support the causes of action in the four counts that are under attack.

### G. Application of Substantive Law.

The platform is finally set for the application of *Celotex's* rule. The centerpiece of the Plaintiff's factual theory was his accusation of a pervasive breach of fiduciary duty. It is appropriate to start the analysis there.

### 1. Count IV: Breach of Fiduciary Duty.

The Plaintiff titled Count IV of his complaint "Breach of Corporate Fiduciary Duty." He first posits that Chowdry, Ibrahim, and Dudhia, or some combination of them, owed the Debtor a fiduciary duty of loyalty when they served it as officers, directors, or shareholders.

As to officers and directors, this general principle has been a fixture of Minnesota law for at least a century, in one articulation or another. *E.g., Janney v. Minneapolis Indust. Exposition,* 79 Minn. 488, 82 N.W. 984, 986 (1900) (relationship of corporation and its directors is "essentially a fiduciary one"; as a general rule, directors may not purchase property of the corporation for their own benefit); *Diedrick v. Helm,* 217 Minn. 483, 14 N.W.2d 913, 919 (1944) (directors of corporation have fiduciary duty to exercise their powers solely for benefit of corporation and its shareholders); *Ray v. Homewood Hospital,* 223 Minn. 440, 27 N.W.2d 409, 411 (1947) (directors may not agree to exercise official duties for benefit of any individual or interest other than corporation itself); *Miller v. Miller,* 301 Minn. 207, 222 N.W.2d 71, 78 (1974) (one entrusted with active management of corporation, such as officer or director, violates fiduciary duty if she appropriates business opportunity properly belonging to corporation); *Westgor v. Grimm,* 318 N.W.2d 56, 58 (Minn. 1982) (directors stand in fiduciary relationship to corporation); *Wenzel v. Mathies,* 542 N.W.2d 634, 641 (Minn.App.1996) (members of board of closely-held corporation owe fiduciary duty of fair treatment to

individual shareholders). This common-law duty has an analog in the statutory duty of directors to discharge their duties "in good faith." *Miller v. Miller*, 222 N.W.2d at 78 n. 6.[39] *But see St. James Capital Corp. v. Pallet Recycling Assoc. of N. Am., Inc.*, 589 N.W.2d 511, 514–516 (Minn.App.1999) (duty of officers and directors of *insolvent* corporation to corporation's creditors is only to avoid self-dealing in corporate assets and opportunities; rejecting "trust fund" theory and declining to impose liability for mere diminution in value of assets, absent proof of self-preference).

More recently, the Minnesota appellate courts have recognized that at least certain types of shareholders owe fiduciary duties to the corporation and, by extension, to other shareholders. *Westgor v. Grimm*, 318 N.W.2d at 58 (controlling shareholders stand in fiduciary relationship to corporation); *Wenzel v. Mathies*, 542 N.W.2d at 641 (in closely-held corporation, shareholders have same fiduciary obligation to corporation as do directors and officers); *Pedro v. Pedro*, 489 N.W.2d 798, 801 (Minn. App.1992) (ditto).

The Plaintiff goes on to allege that the Defendant, "by and through [those] [i]ndividuals, appropriated assets of [the] Debtor" by "causing" the Debtor to purchase motherboards from the Defendant at the allegedly-excessive prices. Then he summarily pleads that the Defendant, "as the intended beneficiary of the actions of the [i]ndividuals," is liable to the bankruptcy estate in damages for all losses "undertaken in [sic] violation of the fiduciary responsibilities owed by the [i]ndividuals to the Debtor and [its] Creditors."

In its answer, the Defendant admitted that Goetz and Ibrahim held officers' positions with it during times that overlapped with their tenure as officers of the Debtor.

It also admitted that Chowdry, Dudhia, and Mirza served simultaneously as directors of both corporations "at one time." The last phrase can fairly be read as including at least some of the time relevant to the Plaintiff's cause of action. The Defendant argues that those facts standing alone do not establish a legal relationship between the Debtor and the Defendant that imposed fiduciary duties on the Defendant. Then it points out that it has been unable to uncover any other evidence to indicate the existence of such a relationship. Though it acknowledges that the common officers and directors had fiduciary duties to the Debtor in their individual status, it maintains that there is no precedent in law to affix liability to the Defendant for their breach of their duty.

In response, the Plaintiff does not meet-or even acknowledge-the Defendant's first point, that the Defendant had no fiduciary duty running directly to the Debtor. He does not point to any potential evidence to make out the basis for such a duty. Instead, the Plaintiff argues that the breaches by Chowdry and the others of their fiduciary duty can be attributed to the Defendant under the theories of agency, vicarious liability, and ratification, making it responsible to the bankruptcy estate for their wrongdoing.

This argument is completely beside the point. It is axiomatic that a claim for the intentional breach of an identified duty must be maintained against a defendant that had been legally or contractually charged with that duty, when the alleged breach occurred, and that liability may be assessed only if the defendant actually breached it. This is a fundamental principle of Anglo–American jurisprudence, driven by its bedrock logic.

▇▇▇▇ The specific duty of loyalty to the Debtor that the law imposed on the

---

**39.** The current repository of the statutory duty is Minn. Stat. § 302A.251 subd. 1:

A director shall discharge the duties of the position of director in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

common officers and directors cannot be affixed to the Defendant merely because it shared those several individual officials with the Debtor. Neither can any duty of good faith that the law imposed on controlling shareholders of the Debtor be imposed on the Defendant, merely because those shareholders included officers, directors, or shareholders of its own. The Plaintiff has cited no authority going to these specific propositions. Logic cuts entirely against them.

Lacking on-point authority, the Plaintiff falls back to cobbling together a chain of reasoning from very general precepts. These include: the act of an agent authorized by the principal is the act of the principal, *Mackenzie v. Ryan*, 230 Minn. 378, 41 N.W.2d 878, 879 (1950), and *Olson v. Thompson*, 273 Minn. 152, 140 N.W.2d 321, 322 (1966); an employer can be made liable for the tortious acts of an employee who committed them while acting within the scope of employment, *Leaon v. Washington County*, 397 N.W.2d 867, 873 (Minn.1986); and, acceptance of the benefit of the tortious act of another person can constitute ratification of it, imposing the binding relationship of principal and agent and the legal liability for the deemed agent's acts, *Fox v. Morse*, 255 Minn. 318, 96 N.W.2d 637, 641 (1959) and *Anderson v. First Nat'l Bank of Pine City*, 303 Minn. 408, 228 N.W.2d 257, 258 (1975).

▆▆▆▆ The effort, however, fails. The principles of agency and *respondeat superior* generally apply in cases of breach of contract, of negligence (involving as it does a breach of simple duty of due care), and

even (in a more guarded sense) of simple intentional tort. However, the Plaintiff has cited no authority under Minnesota law to create derivative or vicarious liability on a duty of personal loyalty, founded on a close relationship of deemed trust unique to an identified fiduciary and a protected beneficiary. Absent such authority, a federal court is ill-suited to be the one to first recognize such a substantial rule under state law. The framework for a transposition of duty and imposition of liability simply cannot be built from the more basic blocks of tort theory here.[40]

Neither can it be founded on the other very generalized pronouncements cited by the Plaintiff: transactions among commonly controlled corporations "are to be regarded with skepticism by the courts and closely scrutinized," *B & S Rigging & Erection, Inc. v. Wydella*, 353 N.W.2d 163, 168 (Minn.App.1984); and, transactions involving corporations under common control are "voidable" where "unfair" to one of the corporations or to shareholders of one of them, *Swanson v. Tomlinson Lumber Mills, Inc.*, 307 Minn. 180, 239 N.W.2d 216, 221 n. 3 (1976). In the context of the decisions that contain them, both of these statements are merely general guidance for the exercise of very specific remedies created under other law: in *B & S Rigging*, the common-law action for avoidance of "preferences" given by an insolvent corporation in payment of claims held by officers or directors themselves,[41] and in *Swanson*, an action by a court-appointed receiver to liquidate the assets of one of several related companies in satisfaction of a judgment. The propriety of these gen-

---

**40.** Even assuming it did lie, the Plaintiff's case for either would fail for lack of any evidence that the individuals in question were acting within the scope of an agency for the Defendant, or an employment by it, when they were acting as directors of the Debtor. *E.g.*, *Mackenzie v. Ryan*, 41 N.W.2d at 879 (agent acting within scope of authority binds principal); *Leaon v. Washington County*, 397 N.W.2d at 873 (for *respondeat superior* to lie, actor must both be personally liable for tort in question and must have been acting within scope of employment in committing it). In

addition, both *Fox v. Morse* and *Anderson* speak in terms of the ratification of a *previously-unauthorized* act of the newly-deemed agent. If the main thrust of the Plaintiff's factual theory is to have any validity at all, the common officers' and directors' actions at the Debtor were anything but "originally unauthorized," *Anderson*, 228 N.W.2d at 258.

**41.** The Minnesota Supreme Court recognized this remedy in *Snyder Electric Co. v. Fleming*, 305 N.W.2d 863 (Minn.1981).

eralities cannot be denied. Nonetheless, they do not override the standard tracks of liability under our law, or themselves authorize a fine-tuned remedy to meet the situation presented here.

 · The fact that the Plaintiff cannot prevail under the theory of breach of direct or imputed fiduciary duty does not defeat Count IV alone, however. Count IV could be fairly read as making a claim against the Defendant for aiding and abetting the commission of a tortious act by a third party, even though the Plaintiff did not plead or argue such a claim in so many words.[42] The Minnesota Supreme Court recently reiterated its

> well recognized rule that all who actively participate in any manner in the commission of a tort, or who procure, command, direct, advise, encourage, aid, or abet its commission, or who ratify it after it is done are jointly and severally liable for the resulting injury.

*Witzman v. Lehrman, Lehrman & Flom,* 601 N.W.2d 179, 185–186 (Minn. 1999) (interior quotation marks and citations omitted). This pronouncement does not exclude intentional torts, or even those stemming from close or confidential relationships; indeed, *Witzman*'s aiding-and-abetting claim stemmed from an alleged breach of fiduciary duty by a trustee under an express trust, and the court did not bar liability on the unique nature of the principal tort.

 As the *Witzman* court framed it,

> A claim for aiding and abetting the tortious conduct of another has three basic elements:
>
> (1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff;

> (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and
>
> (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach.

601 N.W.2d at 187–188 (citing RESTATEMENT (SECOND) OF TORTS § 876(b) (1977)). The proof for the Plaintiff that remains in the record could not support findings on any of these elements. In the first place, there is not sufficient evidence to establish a breach of the duty of loyalty borne by the common directors, common officers, and Goetz. The gravamen of the Plaintiff's complaint is the extraction of the Debtor's profits and its value via an extended pattern of coerced or manipulated price-gouging. There is no probative or substantial evidence of price-gouging left, whether or not it was facilitated by the common officers, common directors, and Goetz. *See* more extended discussion *infra* at pp. 365–366. There is no evidence on which to deem that the Defendant knew of an unlawful breach of duty by those individuals. *See Witzman,* 601 N.W.2d at 188–189 (plaintiff on aiding-and-abetting claim must produce "specific facts showing that [aider/abetter] knew the tortious nature" of primary tortfeasor's acts).[43] Because of the lack of proof of a "facial breach of duty," the Plaintiff bore a heavier burden of showing "actual knowledge that the primary tortfeasor's conduct was wrongful," and could not just rely on a deemed knowledge through the awareness of someone like Chowdry. *Id.*[44] Finally, there again is no direct or circumstantial proof of the Defendant's substantial assistance or encouragement of a breach of

---

**42.** Curiously, the Plaintiff's counsel did not use this theory in opposing the motion at bar. In fairness to the estate, though, it should be treated.

**43.** Apparently the Plaintiff never deposed Chowdry, Mirza, or anyone else connected with the Defendant. At the very least, he has

never produced transcripts from such depositions.

**44.** In this case, a demonstration of patently conflicted allegiances in the form of actual coercion or manipulation and demonstrable price-gouging would have sufficed to make

fiduciary duty; Goetz's heated surmises, accusations, and deductions do not substitute for tangible proof that there really was a scheme. *Cf. Medtronic, Inc. v. ConvaCare, Inc.,* 17 F.3d 252, 255 (8th Cir. 1994) (affirming district court's grant of judgment as a matter of law; there was no evidence to support plaintiff's central assertion, that defendant's designated members of plaintiff's board "were involved in a plot to destroy" plaintiff).

To maintain its motion for summary judgment on Count IV, the Defendant did not have to identify specific facts, or evidence to support them; it only had to point to the apparent lack of evidence to support a recovery against it on the Plaintiff's own claim of breach of fiduciary duty, whether direct, derivative, or aided-and-abetted. The Plaintiff then had a responsive duty of production. He did not produce any evidence that went beyond the Defendant's earlier concession that the Defendant and the Debtor had some common shareholders, and several common officers or directors, at some point during the span of events on which he sued. This was far from enough to prove up the existence of a fiduciary duty in the Defendant itself; to merit imposing vicarious or derivative liability on it for any breach of those persons of their duty; or to establish that the Defendant aided and abetted any such individual breach.

This all casts the issue as one of law, on a small amount of established fact. The Plaintiff failed to muster any legal authority for a recovery in his favor on those acknowledged facts. The Plaintiff cannot prove up Count IV, and the Defendant is entitled to judgment "as a matter of law" on it.

### 2. Substantive Counts for Avoidance, Recovery, and Subordination.

#### a. Count II: 11 U.S.C. § 548(a): Fraudulent Transfer

The Bankruptcy Code empowers trustees to avoid certain pre-petition transfers

out a facial breach of duty. It just is not

of assets made from a debtor to other entities. Among those are transfers deemed to be fraudulent in fact or law, which are avoidable under 11 U.S.C. § 548 if made within one year before the commencement of a bankruptcy case. Relief is available for two different categories of transfers—those accompanied by "actual fraud," governed by 11 U.S.C. § 548(a)(1), and those deemed "constructively fraudulent," governed by 11 U.S.C. § 548(a)(2).

#### i. Section 548(a)(1): Actual Fraud

 Under the first alternative in this statute, a trustee may avoid a prepetition transfer of assets of the debtor if the debtor made the transfer "with actual intent to hinder, delay, or defraud" any past or future creditor. 11 U.S.C. § 548(a)(1). The Eighth Circuit has recognized that direct evidence of such intent is rarely forthcoming, so the trial court may make an inference on the issue "from the circumstances surrounding the transfer." *In re Sherman,* 67 F.3d 1348, 1353 (8th Cir.1995). The courts recognize that certain sorts of events, conditions, or characteristics frequently accompany the execution of a scheme to defraud third-party creditors. The presence of several or more of these "badges of fraud" gives rise to a presumption of fraudulent intent. *Kelly v. Armstrong,* 141 F.3d 799, 802 (8th Cir.1998); *In re Bateman,* 646 F.2d 1220, 1223 (8th Cir.1981). *Cf. In re Sherman,* 67 F.3d at 1353–1354 (presence of several badges of fraud "can constitute conclusive evidence" of the proscribed intent) (citation and internal quotes omitted). If the trustee makes out the basis for such a presumption, the burden shifts to the transferee—which must prove "some legitimate supervening purpose for the transfers at issue." *Kelly v. Armstrong,* 141 F.3d at 802. This a heavy burden:

> The burden which shifts ... is not a burden of going forward with the evi-

there.

dence requiring the [debtor] to explain away nature inferences, but a burden of *proving that he has not committed the objectionable acts with which he has been charged.*

*Id.* (emphasis added; interior quotations omitted).

■ Among the badges of fraud that the trial court may consider in passing on the issue of intent are:

1. the transfer or obligation was to an insider;

2. the debtor retained possession or control of the property transferred after the transfer;

3. the transfer or obligation was disclosed or concealed;

4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5. the transfer was of substantially all the debtor's assets;

6. the debtor absconded;

7. the debtor removed or concealed assets;

8. the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. the debtor transferred the essential assets of the business to a lienor

was transferred the assets to an insider of the debtor.

*In re Sherman,* 67 F.3d at 1353.[45] *See also Kelly v. Armstrong,* 141 F.3d at 802. These badges are the same under the Minnesota enactment of the Uniform Fraudulent Transfer Act. *See* MINN. STAT. § 513.44(b).

■ In his amended complaint, the Plaintiff is not entirely clear in his identification of the transfers he seeks to avoid; in the main text, he identifies the $224,-675.00 of transfers within one year of the bankruptcy filing as his subject, *see* ¶ 15, but at another point he complains more broadly of more sales "at prices inflated above fair market value" throughout the years 1991–1993, *see* ¶¶ 11–14. Count II is pleaded very broadly, with its only reference to its subject reading:

Prior to the filing of the involuntary petition in bankruptcy, Debtor voluntarily transferred substantial funds of Debtor to Defendant . . .

¶ 25. The breadth of the Plaintiff's argument for the motion at bar also suggests the longer time-frame is his target. Ultimately, because the prefatory paragraph of § 548(a) limits avoidance to transfers "made . . . within one year before the date of the filing of the [bankruptcy] petition," the analysis under Count II must be limited to that period.

With the subject thus identified, it is clear that most of the statutory badges are inapplicable. There is no evidence that the Debtor retained possession or control of any of the funds (entirely to the contrary); there is no evidence that either the Debtor or the Defendant concealed the

**45.** In *Sherman,* the Eighth Circuit expressly approved of the use of analogous state law in fact-finding on the issue of intent—there, the Missouri enactment of the Uniform Fraudulent Transfer Act. In recent years, the Circuit has given a uniform construction to the law of actually-fraudulent transfers under state statute and the Bankruptcy Code. *In re Graven,* 936 F.2d 378, 383 (8th Cir.1991) noting that Uniform Fraudulent Conveyance Act and § 548(a)(1) use ("the same standard"); *In re*

*Graven,* 64 F.3d 453 (8th Cir.1995). *See also In re Craig,* 144 F.3d 587, 593 (8th Cir.1998) (Congress intended to bring federal bankruptcy law of fraudulent transfers into conformity with analogous state law); *Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871, 874 (8th Cir.1988) (standard in challenge to discharge under 11 U.S.C. § 727(a)(2)(A), involving allegedly-fraudulent transfer of assets to exempt form, is same as that governing claim of exemption under state law).

payments from any party that might have been interested in them; there is no evidence that the Defendant or any other party had sued or threatened the Debtor with suit in close proximity to the payments. There is no evidence that the payments constituted "substantially all the [D]ebtor's assets"; that the Debtor absconded, or removed or concealed these or any other of its assets; that the payments were made around the time the Debtor incurred a substantial debt; or that the Debtor even made these payments—let alone transferred "the essential assets of [its] business"—through a straw-man-lien-or.

Of the three remaining statutory badges, one is established by concession; the Defendant does not contest the Debtor's contemporaneous or resultant insolvency.[46] However, the second-to-last one—a lack of reasonable equivalence between the purchase price and the value of the motherboards—is utterly unsupported by admissible evidence. *See* analysis *infra* at pp. 365–366. And finally, the Plaintiff's record does not contain enough evidence to make out receipt by an insider—even given the documentation on the Debtor's post-July, 1992 shareholder roster and the makeup of the two parties' boards and officers.

■ The last point requires a more involved analysis. The term "insider" is relevant to § 548(a)(1) only via a judicial gloss that engrafts state statutory considerations. The subsidiary definitions of the term "insider" under Minn. Stat. §§ 513.417(ii) and (iv) are essentially identical to the Bankruptcy Code's definitions at 11 U.S.C. § 101(31)(B) and (E), so one can fairly make use of both to determine whether the Defendant was an insider.[47] Of the statutes' non-exclusive examples, the only one that has any promise of applicability is "affiliate, or insider of an affiliate as if such affiliate were the debtor." "Affiliate" in turn, is defined at the very similar provisions of 11 U.S.C. § 101(2) and Minn. Stat. § 513.41(1)(ii).[48]

The Defendant is not an affiliate of the Debtor. The key to affiliate status under the quoted provisions is an intertwining through the relationship of equity ownership, such as to confer a substantial (though not necessarily controlling) right of franchise at shareholders' meetings. Thus, "affiliates" of a corporate debtor may include the owner or holder of 20

**46.** The evidence to support a finding on this point is the Debtor's various consolidated financial statements for 1992 and 1993, farmed in as Exhibit P to Leonard's affidavit. These documents show a substantial shortfall of assets to meet outstanding liabilities, which meets the balance-sheet standard for insolvency prescribed for other purposes in bankruptcy cases by 11 U.S.C. § 101(32)(A). *See In re Bellanca Aircraft Corp.* 56 B.R. 339, 385 (Bankr.D.Minn.1985) (citing *American Nat'l Bank & Trust Co. of Chicago v. Bone,* 333 F.2d 984, 989 (8th Cir.1964)).

**47.** As numbered and lettered in the Code, these provisions are:

"insider" includes—
. . .
(B) if the debtor is a corporation—
 (i) director of the debtor;
 (ii) officer of the debtor;
 (iii) general partner of the debtor; or
 (iv) partnership in which the debtor is a general partner;
 (v) general partner of the debtor; or

 (vi) relative of a general partner, director, officer, or person in control of the debtor;
. . .
(E) affiliate, or insider of an affiliate as if such affiliate were the debtor;
Minn. Stat. § 513.41(7)(ii)(C) adds "a person in control of the debtor" to the list.

**48.** Again as arranged in the Code, the relevant portions of this definition are:

"affiliate" means—
(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . .
. . .
(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . .

percent or more of its voting shares, or one who directly or indirectly controls a block of such size; another corporation in which the *debtor* holds or controls such an equity interest; or a corporation in which a third party holds or controls such an equity interest even as it holds the same in the debtor. All of these affiliates are per-force insiders. The point here clearly is access to the seat of power at the debtor, conferred by the substantiality of an equity interest, so as to give influence greater than that held by a creditor in a more removed position.

At the very most—and only by assuming certain facts not in evidence—the Plaintiff could prove that the Defendant indirectly controlled 15.3 percent of the Debtor's voting shares after July 22, 1992: a block held or controlled by Chowdry, Mirza (through the instrumentalities of Marjac Investments, Inc., and Safa Trust, Inc.), Richard Love, and Inder Singh.[49] The Plaintiff has produced no evidence that the individuals and entities that held the remainder of the post-"buyout" 51 percent voting majority were tied to the Defendant in any way—or that any of the Debtor's continuing minority shareholders were either. The SEC Schedule 13D states at p. 16 that the group's purchase of the 51 percent interest was "to acquire control of" the Debtor, but on its face this means nothing more than control by the group; the Defendant is nowhere mentioned in connection with this reference. There is a glaring gap in the proof here that cannot be bridged by Goetz's conclusory accusations. The Plaintiff has not produced specific, pointed evidence to support affiliate status for the Defendant, and thus could not establish the Defendant as an affiliate-insider of the Debtor under § 101(31)(E).

■ The statutory examples of § 101(31), of course, are not exclusive. In pondering other characteristics that could confer the status, some courts have dwelled on any circumstance that gave the putative insider power over the debtor's decision-making process (and, in particular, over the decision to make the payments or to enter into the transactions that are alleged to be avoidable). *In re Schuman,* 81 B.R. 583, 586 (9th Cir. BAP 1987); *In re Lemanski,* 56 B.R. 981, 983 (Bankr.W.D.Wis.1986); *In re F & S Central Mfg. Corp.,* 53 B.R. 842, 848 (Bankr. E.D.N.Y.1985); *In re Taylor,* 29 B.R. 5, 7 (Bankr.W.D.Ky.1983); *In re Montanino,* 15 B.R. 307, 310 (Bankr.D.N.J.1981). Others have brushed more broadly, opining that insider status could be founded on any complex of relationship and conduct between debtor and defendant, so close that it overrode more independent business judgment to provide the motivation for the subject transaction.[50] *In re Three Flint Hill L.P.,* 213 B.R. 292, 300 (D.Md.1997). *See also* H.R. REP. No. 595, 95th Cong. 1st Sess. 312 (1977); S. REP. No. 989, 95th Cong.2d Sess. 25 (1978). This broader one is an appropriate formulation, as long as it is applied with some restraint that is channeled by the policy underpinnings of the applicable substantive law.

The Plaintiff has no more than scattered circumstances on which to propose the existence of such an intertwining. The Debtor's dealings with the Defendant began at some indeterminate time before the July, 1992 stock purchase; the relationship was early characterized by volume sales and a generous grant of trade credit to the Debtor in accordance with the Defendant's corporate policy. The Defendant does not challenge the reasonableness of those sales and by implication does not impugn the arms-length nature of the contemporary relationship.

While the Plaintiff summarily accuses the Defendant of a predatory refusal to give volume discounts on the sales made

---

**49.** This is gleaned from pp. 16–17 of the SEC Schedule 13D that is Exhibit A to the Plaintiff's affidavit.

**50.** This difference in formulations may be only a matter of semantics-control by another name, to drop a high-blown paraphrase.

after July, 1992, he has produced no admissible evidence that such concessions were standard in the industry, or that they were merited by the parties' respective positions in the dynamic of bargaining. Against this gap in the Trustee's case is arrayed the Defendant's proof, that the prices it gave the Debtor were generally competitive with those it charged its other customers.[51] Similarly, the Plaintiff has produced no probative, substantial evidence that the Debtor's purchasing decisions were compromised in any way by the undue influence of the Defendant, or by conflicted loyalties on the part of a decision-maker.[52] Goetz's statements that he believed that the terms were the result of a manipulated stranglehold on the Debtor are almost all inadmissible. By contrast, the Defendant provided the deposition testimony of the Debtor's own senior buyer and its operating officer, both of whom did control the purchasing process. These employees stated without equivocation that the Defendant's terms and prices were the best the Debtor could get at the time,

given its own precarious financial posture. To cap the issue, the Defendant points out that, as early as September 14, 1992, the Debtor's new board recognized the possibility of a conflict of interest on issues arising out of its long-term relationship with the Defendant, due to the presence of the common directors. The board then took formal action to isolate the influence as to a long-term supply commitment, in a way consistent with state statute.[53]

There simply is no evidence of record to make out the broader sort of insider status for the Defendant under *Three Flint Hill.* This badge of fraud, then, is lacking.

■ All the Plaintiff has by way of badges, then, is the Debtor's mounting insolvency during the period. One badge alone, no matter the strength of its evidence, does not make out an actual intent to hinder, delay or defraud creditors. *In re Sherman,* 67 F.3d at 1354. Having shown that the Plaintiff is unable to make a *prima facie* case under § 548(a)(1), the Defendant is entitled to summary judg-

**51.** That proof is the affidavit of Gordon Wong, the Defendant's controller. Wong performed a comparative analysis of the prices the Defendant charged the Debtor and several other customers. He concluded that the prices charged to the Debtor were "often lower than charged to other customers," and "[s]ometimes ... slightly higher than to other entities," with the variations possibly attributed to a "a price break for larger quantities," or "[o]ther variables (such as payment history)."

**52.** The small remaining part of Goetz's affidavit that goes to this issue is the reference in paragraph 19 to Chowdry's threat to fire him if the Debtor did not continue to purchase from the Defendant. With the lack of any evidence of price-gouging, its probity on the issue of undue influence is equivocal at best.

**53.** At a meeting on that date, the board recognized that an ongoing supplier relationship under contract with the Defendant "was a transaction in which certain of the Director would be considered interested." It then appointed Lazere and Goetz as a disinterested committee, to negotiate and execute an agreement on terms "fair and reasonable" to the Debtor. (This was after the Defendant had terminated Goetz's employment.) Though a

final formal contract was never entered, this was the appropriate way to address the problem of the directors' conflict:

> A contract or other transaction between a corporation and one or more of its directors, or between a corporation and an organization in or of which one or more of its directors are directors, officers, or legal representatives, or have a material financial interest, is not void or voidable because the director or directors or the other organizations are parties or because the director or directors are present at the meeting of the shareholders or the board or a committee at which the contract or transaction is authorized, approved, or ratified, if:
>
> . . .
>
> (c) the material facts to the contract or transaction and as to the director's or directors' interest are fully disclosed or known to the board or a committee, and the board and committee authorizes, approves, or ratifies the contract or transaction in good faith by majority of the board or committee, but the interested director or directors shall not be counted in determining the presence of quorum and shall not vote . . .

MINN. STAT. § 302A.255.

ment on that theory of avoidance under Count II.

### ii. Section 548(a)(2): Constructive Fraud

Under the constructive fraud provision of the Bankruptcy Code's fraudulent transfer remedy, a trustee may avoid a prepetition transfer of assets of a debtor if the debtor did not receive reasonably-equivalent value in exchange, 11 U.S.C. § 548(a)(2)(A), and if:

The debtor was insolvent at the time, or was made insolvent by the transfer, § 548(a)(2)(B)(i), and *In re Bargfrede*, 117 F.3d 1078, 1079 (8th Cir.1997); or The debtor was left with "unreasonably small capital" for any business or transaction in which it was then engaged or in which it was about to be engaged, § 548(a)(2)(B)(ii).

*See also In re Minnesota Utility Contracting, Inc.*, 110 B.R. 414, 417 (D.Minn.1990). From the statute's framing of the elements, it is obvious that the trustee need not prove any particular state of mind on the part of either debtor or defendant in connection with such transfers; if the value of the property rights exchanged is so out of parity that the Debtor received an "unreasonably" small consideration, the transfer is avoidable.[54]

■■■ The trustee bears the burden on all of the elements under the statute. *In re Craig*, 144 F.3d at 590; *In re Bargfrede*, 117 F.3d at 1080–1081. The issue of the reasonable equivalence of value is a question of fact. *In re Ozark Restaurant*

*Equip. Co., Inc.*, 850 F.2d 342, 344 (8th Cir.1988). The inquiry on this element is fundamentally one of common sense, measured against market reality:

The concept of reasonably-equivalent value is a means of determining if the debtor received a fair exchange in the market place for the goods transferred. Considering all the factors bearing on the sale, did the debtor receive fair market value for the property.

*In re Ozark Restaurant Equip. Co., Inc.*, 850 F.2d at 344–345.[55]

■■■ The Plaintiff's argument on this theory of recovery is that the Debtor did not receive value in motherboards that was reasonably equivalent to the price it was paying to the Defendant; essentially, that the Debtor was "forced" to pay far too much for what it got, impairing and ultimately destroying its solvency. The Defendant seeks summary judgment on this theory, on the ground that the record no longer contains *any* evidence going to the reasonable equivalence of its prices.

In all material respects, the Defendant is correct. When the inadmissible material is removed from consideration, there is virtually nothing in the record to enable even a comparison of the Defendant's prices with those available from *any* other supplier, let alone those available generally in the marketplace. A finder of fact could not even do the initial weighing for the consideration of "equivalence," let alone consider the "reasonableness" of the result.[56] Again, then, the conclusion is compelled: the Plaintiff could not prove an

---

**54.** Given the intent-neutrality of the statutory elements, it is a misnomer and unnecessarily inflammatory to tag such transactions with the word "fraudulent." Nonetheless, the title of § 548 does so.

**55.** The phrasing of this quotation shows that the positions of the *Ozark Restaurant Equip. Co.* debtor and defendant were reversed; the debtor was alleged to have sold large amounts of tangible inventory to a related company at prices so low that the debtor could not generate a profit to enable it to pay its own creditors. This difference is not a distinction; the

observation in *Ozark Restaurant Equip. Co.* is tailored to the facts before the court there, but the basic thought is the same in all proceedings involving sales alleged to have been collusive.

**56.** Because the second stage of the inquiry is not even implicated, it is not necessary to even examine the Defendant's evidence-much of which would have supported its theory that any discrepancy in the Defendant's prices was the result of adjustment for enhanced credit risk.

essential element of this theory of recovery, and the Defendant is entitled to summary judgment on this prong of § 548(a)(2).

### b. *Count III: MINN. STAT. §§ 513.41–51: Fraudulent Transfer*

■ 11 U.S.C. § 544(b)[57] empowers trustees to exercise rights of avoidance granted to certain creditors under state law. Among such powers are those under state enactments of the Uniform Fraudulent Transfer Act, such as that codified in Minnesota at MINN. STAT. §§ 513.41–51. *In re Bargfrede*, 117 F.3d at 1080; *In re Graven*, 936 F.2d at 383.

### i. *MINN. STAT. § 513.44(a)(1): Actual Fraud*

■ The Minnesota enactment of the Uniform Fraudulent Transfer Act contains a provision nearly identical to 11 U.S.C. § 548(a)(1) in its elements, MINN. STAT. § 513.44(a)(1).[58] As noted earlier, at pp. 59–61, the statute itself contemplates a process of inference on the "actual intent" element, based upon the existence or nonexistence of the badges of fraud enumerated under MINN. STAT. § 513.44(b) and any "other factors." *See also In re Butler*, 552 N.W.2d 226, 231 (Minn.1996); *New Horizon Ent., Inc. v. Contemp. Closet Design, Inc.*, 570 N.W.2d 12, 15–16 (Minn.App. 1997); *Citizens State Bank of Hayfield v.*

*Leth*, 450 N.W.2d 923, 927 (Minn.App. 1990); *Argonaut Ins. Co. v. Cooper*, 395 N.W.2d 119, 121 (Minn.App.1986) (the last decided under prior law, Minnesota enactment of Uniform Fraudulent Conveyance Act). As with § 548(a)(1), the plaintiff bears the burden of proof on the issue of actual intent to defraud. *Snyder Elec. Co. v. Fleming*, 305 N.W.2d at 867 (decided under UFCA).

Because the Eighth Circuit's gloss on § 548(a)(1) incorporates this state-law analysis virtually wholesale, no additional discussion is warranted. The record lacks any evidence to prove up an essential element of the Plaintiff's case under this statutory theory, and the Defendant is entitled to summary judgment for it as well.

### ii. *MINN. STAT. § 513.44(a)(2): Constructive Fraud*

■ The Minnesota enactment of the Uniform Fraudulent Transfer Act contains a provision almost identical to 11 U.S.C. § 548(a)(2), MINN. STAT. § 513.44(a)(2).[59] *See, in general, In re Butler*, 552 N.W.2d at 230–231; *New Horizon Ent., Inc. v. Contemp. Closet Design, Inc.*, 570 N.W.2d at 16. The issue of the reasonable equivalence of value is, again, a question of fact. *New Horizon Ent., Inc. v. Contemp. Closet Design, Inc.*, 570 N.W.2d at 16; *First Nat'l Bank of Cold Spring v. Jaeger*, 408

---

**57.** In pertinent part, this statute provides:
 The trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [11 U.S.C. § ] 502 ...or that is not allowable only under [11 U.S.C. § ] 502(e) ...

**58.** In pertinent part, the text of the statute is:
 (a) A transfer made ... incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ... if the debtor made the transfer...
 (1) with actual intent to hinder, delay, or defraud any creditor of the debtor ...

**59.** In pertinent part, this statute provides:

(a) A transfer made ... incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ... if the debtor made the transfer ...
 ...
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
 (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
 (ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

N.W.2d 667, 670 (Minn.App.1987) (applying "fair consideration" element of UFCA).

Again, because of the near-identity of the statutory elements and the inherently-factual nature of the primary issue, the analysis under the federal-law analog is applicable here and no further discussion is warranted. The Defendant is entitled to summary judgment on this theory of recovery as well.

*iii.* MINN. STAT. *§ 513.45(b): Constructive Fraud (Alternative Theory)*

The Minnesota enactment of the Fraudulent Transfer Act has a final alternative remedy applicable to another type of constructively-fraudulent transfer, MINN. STAT. § 513.45(b).[60] In Count III of this complaint, the Plaintiff alleged facts that appear to go to this alternate theory. His attorney does not touch on the provision in this argument, but the Defendant seeks summary judgment as to it as well.

The earlier analysis on the issue of the Defendant's putative "insider" status is applicable here, given the common definition under the statutes. In addition, there is no evidence at all going to whether the Defendant "had reasonable cause to believe that the [D]ebtor was insolvent," at any point during the months-long series of sales.[61] The Plaintiff has not shown that he could prove up these two elements of this right of avoidance. The Defendant is entitled to summary judgment on this last aspect of the Plaintiff's state-law theory.

*c.* Count V: 11 U.S.C. § 510(c): *Equitable Subordination.*

In Count V of his complaint, the Plaintiff alleges that the Defendant's coercion of the Debtor was so inequitable as to merit subordinating the Defendant's allowed claim to those of all other secured and unsecured claims against the estate in this case. This would relegate the claim to the lowest level for distribution of assets.

Under 11 U.S.C. § 510(c), the Court may "subordinate for purposes of distribution [from the bankruptcy estate] . . . an allowed claim to . . . another allowed claim," "under the principles of equitable subordination." In enacting this provision, Congress intended to incorporate long-standing caselaw precedent under the Bankruptcy Act of 1898. *United States v. Noland,* 517 U.S. 535, 539, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). In an influential pre-Code decision, the Fifth Circuit recognized that the Court has broad, but not unlimited, power to subordinate claims. *In re Mobile Steel Co.,* 563 F.2d 692, 699 (5th Cir.1977).[62]

The Eighth Circuit has identified three elements that must be proved to merit subordination under § 510(c):

1. The claimant must have engaged in some type of inequitable conduct;

2. The claimant's misconduct must have resulted in injury to other creditors, or conferred an unfair advantage on the claimant; and

3. The results of subordination must not be inconsistent with the other provisions of the Bankruptcy Code.

*In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1283 (8th Cir.1988). *See also In re Mobile Steel Co.,* 563 F.2d at 699–700. A showing of inequitable conduct has been required in several other published decisions from the courts in this district and circuit. *E.g., Wegner v. Grunewaldt,* 821 F.2d 1317, 1323 (8th Cir.1987) (absent a

---

**60.** The text of this statute is:

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider and reasonable cause to believe that the debtor was insolvent.

**61.** Again, the curious lack of any discovery of the Defendant's principals drives the result here.

**62.** In *United States v. Noland,* the Supreme Court recognized that most district and circuit courts had followed *Mobile Steel's* formulation. 517 U.S. at 539, 116 S.Ct. 1524.

specific finding of fraudulent or inequitable conduct, equitable subordination will not lie); *Farmers Bank v. Julian*, 383 F.2d 314, 323 (8th Cir.1967) (decided under Bankruptcy Act of 1898); *In re Spring Grove Livestock Exch., Inc.*, 205 B.R. 149, 162 (Bankr.D.Minn.1997); *In re Minnesota Kicks, Inc.*, 48 B.R. 93, 106 (Bankr. D.Minn.1985) (citing earlier unpublished district court decision requiring showing of inequitable conduct and resultant injury or unfair advantage). The character and extent of misconduct that will merit equitable subordination depends on the prior relationship of the parties; a claimant-insider's conduct must be closely scrutinized. *In re Spring Grove Livestock Exch., Inc.*, 205 B.R. at 162. *See also In re Kids Creek Partners, L.P.*, 212 B.R. 898, 928 (Bankr. N.D.Ill.1997).

 As noted earlier, there is insufficient evidence to support insider status for the Defendant. This makes the Plaintiff's burden heavier; it must show "gross misconduct" on the Defendant's part, or something equivalent to it. *In re Minnesota Kicks, Inc.*, 48 B.R. at 106. The scant record as to the parties' course of dealing cannot support such a finding. There is no evidence to support either the Plain-

tiff's charges of manipulation of the Debtor's operations and subversion of its cashflow, or his allegations of price-gouging in coerced purchases. The small bit of remaining evidence supports no finding more suggestive than that the Defendant was obdurate in its pricing demands on the Debtor.[63] At the risk of sounding dismissive, one can only say "that's business."

The Plaintiff simply could not prove up the grounds for equitable subordination at trial. The Defendant is entitled to summary judgment on Count V of the Plaintiff's complaint also.

## V. CONCLUSION

The analysis was long and the task of performing it was arduous, but the conclusion is simple: the Defendant's motion must be granted, and the Plaintiff denied relief under Counts II, III, IV, and V of his complaint.[64]

 This does not mean that judgment can be entered now, however. Count I of the Plaintiff's complaint is still unresolved, and to some degree it is intertwined factually with the counts just adjudicated. This triggers FED. R. BANKR. P. 7054(a).[65] Where there is a "significant

---

**63.** This bit is at paragraph 19 of Goetz's affidavit: Chowdry's rejoinder to Goetz that the level of the Defendant's prices was Goetz's "problem"-and obviously no one else's-and that he just had to "go find other money."

**64.** This terminates litigation that portended a multi-million-dollar recovery for the estate, at least nominally. The result is none too savory, given the nature of the Plaintiff's accusations and the dominance of the Debtor's debt structure by claims in favor of the trade vendors that kept it operating during its downspin. One cannot say that the termination was premature, however; the governing rule demanded it, given the Plaintiff's failure to stand and deliver. Trustees in bankruptcy often have an unenviable lot-saddled with the wreckage of businesses brought down by mismanagement or wrongdoing and having to pursue redress for it, inheriting poor or non-existent business records, forsaken by management scattered to new jobs and witnesses gone to ground. These unavoidable incidents of their duty do make it more difficult to carry on litigation for the estate, and

sometimes merit some leniency on procedural considerations. Nonetheless, if trustees sue out complex lawsuits in the performance of their duties, they cannot expect to be exempted from the same burdens of proof that all other litigants must bear on an opponent's dispositive motion. One cannot defend a *Celotex*-styled motion for summary judgment by simply promising that responsive evidence will be developed subsequently-which is what the Plaintiff offered as a fallback position here. *Petroskey v. Lommen, Nelson, Cole & Stageberg, P.A.*, 847 F.Supp. 1437, 1445 (D.Minn.1994).

**65.** By its terms, this rule incorporates the following provision of FED. R. CIV. P. 54(b):

When more than one claim for relief is presented as an action ... the court may direct entry of a final judgment as to one or more but fewer than all of the claims ... only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

relationship" between the count(s) on pretrial motion and those remaining, the court should not make the certification contemplated by this rule. *In re Flight Transp. Corp. Securities Litigation,* 825 F.2d 1249, 1251 (8th Cir.1987), *cert. den.,* 485 U.S. 936, 108 S.Ct. 1113, 99 L.Ed.2d 273 (1988); *Hayden v. McDonald,* 719 F.2d 266, 270 (8th Cir.1983). This will prevent piecemeal appeals over claims that are founded on common nexi of fact or similar legal issues. *Interstate Power Co. v. Kansas City Power & Light Co.,* 992 F.2d 804, 807 (8th Cir.1993). Given the clear message of the rule and the binding precedent construing it, it would be inappropriate to order entry of judgment on the counts just adjudicated.

### *ORDER*

On the discussion just memorialized,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The Defendant's motion for summary judgment is granted.

2. The Plaintiff is not entitled to recover damages against the Defendant for the breach, if any, of fiduciary duty to the Debtor that was committed by any and all persons who were shareholders, officers, and/or directors of the Debtor at the same time as they were shareholders, officers, and/or directors of the Defendant.

3. The Plaintiff is not entitled to avoid any and all payment made by the Debtor to the Defendant in consideration for the purchase of motherboards or other computer components during the year prior to the commencement of BKY 94–34357, under color of 11 U.S.C. § 548(a)(1)-(2).

4. The Plaintiff is not entitled to avoid any and all payment made by the Debtor to the Defendant in consideration for the purchase of motherboards or other computer components at any point prior to the commencement of BKY 94–34357, under color of 11 U.S.C. § 544 and MINN. STAT. §§ 513.41–.51.

5. The Defendant's allowed claim in BKY 94–34357 will not be subordinated to the claim of any other creditor pursuant to 11 U.S.C. § 510(c)(1).

6. The entry of judgment on Terms 2–5 of this order will be deferred, pending the adjudication on Count I of the Plaintiff's amended complaint, or other resolution of it.

### "EXHIBIT A"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

In Re: Northgate Computer Systems, Inc., Debtor.

BKY.94–34357

Brian F. Leonard, Trustee Plaintiff,

vs.

Mylex Corporation, Defendant.

ADV 96–3298

Chapter 7

AFFIDAVIT OF JAMES GOETZ

STATE OF MINNESOTA)

COUNTY OF HENNEPIN)

James Goetz, being first duly sworn upon oath, states and alleges as follows:

1. I was the president and CEO of Northgate Computer Systems, Inc. ("Debtor") from August of 1992 through April of 1993, although I was directly involved in conducting due diligence of Debtor's records at the request of Mylex sometime prior to July of 1992. I have personal knowledge of the facts contained herein, . . .

2. My educational degrees include a CPA, MBA and several engineering concentrations related to computer science. From 1976 to 1980, I worked for NCR, and held positions in several corporate areas, including finance, operations and other managerial positions. From 1980 through 1985, I worked for DataPoint Corporation,

which was the first manufacturer of the microprocessor chip. I held several positions for DataPoint Corporation, including financial planning positions and telecommunications positions. In the late 1980s, I became acquainted with S.L. Tandon, who ran a company known as Tandon Corporation. Tandon Corporation is in the business of designing, marketing, manufacturing and selling personal computers. In 1988, I moved to California to help Tandon Corporation develop its personal computer business. In February of 1992, I accepted a position with Mylex as its Executive Vice President.

3. Through my experiences at NCR, DataPoint Corporation, Tandon Corporation, Mylex and Debtor, I obtained detailed working knowledge of the workings of the personal computer industry, including the technical and financial aspects. Specifically, I developed many contacts in the personal computer industry with people at Intel Corporation, IBM, Compaq, Micronics, and many other companies, including a host of Taiwanese and Korean companies. During the early 1990s, foreign manufacturers of personal computers and their components were beginning to effectively compete against their American counterparts, and the worldwide market for personal computer components was experiencing substantial pressures to reduce prices. Even with the shift in 1990–1992 from the 386 microprocessing chip to the 486 chip, prices on the 486 chip were substantially lowered throughout the industry on a monthly, if not weekly basis.

4. ...

5. With respect to the supply relationship between Mylex and Debtor, ... such sales continued throughout most of 1993. Total sales by Mylex to Debtor during 1992 and the early part of 1993 exceeded $20 million dollars....

6. My first contacts with Mylex occurred while I was employed at Tandon Corporation. Mylex supplied mother boards to Tandon Corporation. I first met Dr. M. Akram Chowdry, the president of Mylex, in 1989. Over the next couple years, Dr. Chowdry sought to employ me at Mylex.... In late 1991, in fact, I was offered the position of executive vice president of Mylex. This offer was made by Dr. Chowdry on behalf of Mylex, and with the acquiescence of my employer at Tandon Corporation. Initially, I had no interest in being employed by Mylex solely for the purpose of facilitating a purchase of Debtor. However, in late 1991, I became aware of a high performance disk array product that was · being researched and developed by Mylex. Upon further investigation and research by me, I determined that the disk array product would likely be in high demand in the market and become a very successful product for Mylex. Thus, based upon the outlook for the disk array product, I agreed to go to Mylex in February of 1992.

7. Prior to 1991, and during my tenure at Mylex, my understanding of Mylex' business strategy was to offer generous lines of credit to high risk start-up companies in the personal computer industry. The effect of such a strategy was to allow Mylex' business to grow dramatically over a short time period, which served as a substantial benefit to Mylex shareholders.... Intel Corporation has exercised much control over the design of mother boards due to its developing dominance in the computer chip industry.... Mylex needed to remain profitable to stay on good terms with its sources of finance....

8. By 1992, it became clear that someone would acquire Debtor, although the ultimate purchaser had not yet been determined.... When I agreed to come on to Mylex as its executive vice president, however, I was led into believing that the disk array product would be ready for market in the summer of 1992. Several potential buyers of Debtor existed in 1992, including Mylex.

9. ... He successfully did so through the assistance of individuals and entities

that were at that time officers, directors, shareholders and employees of Mylex.... The buyout was completed on July 22, 1992.

10. ... I personally saw many of the Mylex employee stock subscription agreements for Debtor's stock. In one particular case, Art Lazere, owner and founder of Debtor, sent me a memoranda on January 14, 1993, ...

11. ... I conducted due diligence at Debtor prior to July 22, 1992, and learned that a large capital infusion was necessary to continue its operations and get back to profitability.

12. In August of 1992, after the sale of Debtor had been completed, I did a more thorough job of researching its financial condition and found a large dollar amount of write-offs, including inventory and receivables. I understood that my role as interim president and CEO was to assist Debtor into going private. Initially, I planned to retain my position with Mylex, and only expected to serve in a role at Debtor for a limited period of time.

13. On August 6, 1992, my employment with Debtor began, and the specific terms of employment agreement were discussed with Dr. Chowdry, and agreed upon for me as interim president of Debtor. Based upon my agreements with Mylex, I moved to Minnesota with my family, and placed my kids in school in Minnesota.

14. In preparation for a September 14, 1992 board of directors meeting for Debtor, I prepared a detailed action plan for returning Debtor to profitability. I also planned to finalize my employment agreement at that meeting. I was shocked at that meeting, which was attended by Dr. Chowdry and several of his associates that were officers, directors, shareholders and employees of Mylex, including Dr. M. Yaqub Mirza, Inder Singh, Richard J. Love, Mr. Ismail Dudhia and Ashik Dudhia, ... The only directors of Debtor at that meeting were Art Lazere, Richard J. Love, Dr.

Mirza and myself. Later in September, 1992, Dr. Chowdry presented me with a new employment contract and also notified me that I was fired from any positions held with Mylex. Again, Dr. Chowdry wasn't even an officer or director of Debtor at this time.

15. A significant part of my action plan for Debtor in the fall of 1992 included developing a notebook computer product, that actually got to market within three months. In fact, once the product went to market, I continually experienced a substantial backlog of orders. The notebook product gained industrywide recognition, and Debtor received a PC Computing award for the notebook computer. See attached Exhibits B & C....

16. In late October of 1992, specifically, Dr. Chowdry came to Minneapolis to meet with me regarding prices and sales of computer products containing Mylex motherboards....

17. By October of 1992, Dr. Chowdry had been added to the Northgate board of directors. In fact, after the July 22, 1992 sale of Northgate, Art Lazere was the only remaining Northgate board member from prior to the sale. All other board members of Debtor, including Dr. Chowdry, Dr. Mirza, Richard Love and myself, had a relationship with Mylex. In September of 1992, a supply contract under which Mylex would become the sole supplier of motherboards to Debtor was first presented to me, although never signed.... I felt, as an officer of Debtor, that I could not ethically sign this contract, and am not aware that such a supply contract was ever signed by Debtor.

18. Throughout the winter of 1992 and 1993, Mylex was exerting extreme pressure on Debtor to continue purchasing mother boards ... Even though the supply agreement was never signed, ...

19. In December of 1992, Dr. Chowdry made a specific visit to Minnesota ... During one such private conversation with me, Dr. Chowdry and I were discussing

the necessary financing for Debtor's operations, and Dr. Chowdry's promises to find additional financing. When I complained about high prices for Mylex products that were severely diminishing cash flows, Dr. Chowdry said "it's your problem about the prices, go find other money." Dr. Chowdry had previously threatened, in November of 1992, that he would not make efforts to raise additional capital for Debtor if I refused to play ball with him and go along with his efforts to charge Debtor ... for mother boards. On this as well as other occasions, Dr. Chowdry threatened that I would be fired if Debtor did not purchase Mylex products at the prices set by Dr. Chowdry.

20. In December of 1992, Dr. Mirza also called ... with respect to making a $500,000.00 preferential payment to Mylex. I recorded my conversation with Dr. Mirza, ... In addition to Dr. Mirza pressuring me to send payments to Mylex and to purchase only from Mylex, I also discussed with him my desire to replace Mylex as a supplier with IBM, since IBM and several other vendors would extend a line of credit and sell motherboards for 30% less than the Mylex prices.

21. In February of 1993, ... Khaled Ibrahim, formerly the vice president of finance of Mylex, become the CFO of Debtor.... Mr. Ibrahim also took steps to specifically favor Mylex over other suppliers....

22. With respect to the Micronics deal, in January of 1993, I undertook to find an alternative supplier of mother boards for Northgate, due to the high prices charged by Mylex. Steve Kitrosser of Micronics agreed to sell motherboards that were superior in performance to the Mylex motherboards, and to extend $500,000.00 in a line of credit to Debtor for the purchase of such motherboards.... The prices for mother boards offered by Micronics were substantially lower than the prices charged by Mylex for mother boards....

23. ...

24. From January to April of 1993, I prepared several letters to the board of directors with respect to Mr. Ibrahim's handling of financing issues and essentially eliminating our available sources of financing.... While serving as president and CEO of Debtor, I have personally learned that ... I also found a large payment, of at least several hundred thousand dollars, that came in March of 1993 from a leasing company....

25. ... Mylex, however, was willing to extend several million dollars in trade credit financing to Debtor, so long as Debtor paid Mylex ... for motherboards....

### FURTHER YOUR AFFIANT SAYETH NAUGHT.